STEWART TITLE GUARANTY COMPANY *v.*
AMERICAN ABSTRACT & TITLE COMPANY

04-789 215 S.W.3d 596

Supreme Court of Arkansas
Opinion delivered October 13, 2005

[Rehearing denied November 17 2005.*]

---

* GLAZE, J., would grant rehearing.

*Gill Elrod Ragon Owen & Sherman, P.A.*, by: *Marie-B Miller* and *Derrick Davidson*, for appellant.

*David M. Hargis*, for appellee.

JIM GUNTER, Justice. This appeal arises from a jury verdict in favor of appellee, American Abstract & Title Company, Inc. (Abstract), a title insurance agent in Pulaski County, against appellant, Stewart Title Guaranty Company (Guaranty) for tortious interference with business expectancy. Guaranty is a title insurance underwriter with its principal place of business in Houston, Texas, and Stewart Title of Arkansas, Inc. (STAR) is Guaranty's title insurance agent in Pulaski County. Guaranty appeals the jury's verdict, arguing that Abstract did not have a valid business expectancy with Guaranty, and that we should reverse the jury's award of one million dollars in compensatory and punitive damages. We affirm the jury's verdict.

On August 27, 2003, Abstract filed a second amended and substituted complaint, alleging that Guaranty and STAR engaged in interference with business expectancy in violation of the Arkansas Unfair Practices Act, codified at Ark. Code Ann. § 4-75-201 *et seq.* (Repl. 2001), Article 2, Section 19 of the Arkansas Constitution, and the Real Estate Settlement Procedures Act, codified at 12 U.S.C. § 2617(a) (1994). Specifically, Abstract alleged that Guaranty entered into "sham transactions," or alleged kickback schemes, involving Real Estate Central, Roddy McCaskill and Truman Ball, Jeff Fuller, Val Hansen with Re/Max Realty, and Rainey Realty. Abstract made the following allegations with regard to these alleged kickback schemes. First, Guaranty established "marketing agreements," which were promoted under the guise of business promotion and advertising, with McCaskill and Ball, Rainey Realty, and Real Estate Central that were alleged kickback schemes through which these realty companies allegedly received money through closing and title services in exchange for business referrals. Second, Guaranty implemented a TitleMax program whereby Fuller and Hansen created shell corporations, which became Guaranty's agents, and Fuller and Hansen's customers were referred through these shell corporations to Guaranty for all the closing and title services, whereupon Fuller and Hansen were paid sums of money from those closing services for every customer steered in this manner. Third, Guaranty and STAR paid the salaries of their employees who provided their services as "closing coordinators" to real estate brokerage firms, namely Rector Phillips Morse and Rainey Realty, and those employees were paid bonuses, depending on how many referrals of closing services could be steered to appellants. Abstract also alleged that the customers did not have the knowledge that the closing services and the title insurance costs would be significantly higher in price to cover these referral costs. Abstract further alleged that Guaranty made donations to his church at the directive of Roddy McCaskill from 1999 until February 2000, and called these donations payments for referrals of the closing and title insurance business. In its complaint, Abstract asserted that "these expenditures demonstrate that over one million dollars ($1,000,000.00) has been injected into the market by [STAR] with [Guaranty] directly supplying the funds . . . with the intent and with the result that fair competition would be injured in the economic market, all such kickbacks having the effect of destroying competition in the economic market[.]"

Guaranty denied that it interfered with Abstract's business expectancy. Guaranty maintained that its practices were lawful marketing programs directed at the real estate market for the purpose of recruiting real estate agents to refer Guaranty customers.

On October 16, 2003, a jury was empaneled, and Abstract presented its claims for violation of Ark. Code Ann. § 4-75-208 of the Arkansas Unfair Practices Act and for tortious interference of business expectancy. On October 24, 2003, at the conclusion of Abstract's case, Guaranty and STAR made a written motion for directed verdict, arguing that Abstract did not prove (1) an intentional inference and (2) a valid business expectancy. During a hearing on the motion, counsel for Guaranty and STAR argued that Abstract failed to prove that there was intentional interference. The trial court granted Guaranty and STAR's motion with respect to Roddy McCaskill, but denied the remainder of the motion. At the conclusion of the evidence at trial, Guaranty and STAR renewed their motion for directed verdict, and the trial court denied the motion.

On October 28, 2003, the jury found in favor of Abstract on its claim for tortious interference with business expectancy, and awarded Abstract $500,000.00 in compensatory damages and $500,000.00 in punitive damages. The jury rendered its verdict in favor of Guaranty and STAR on the remaining claims. On November 6, 2003, the trial court entered a judgment consistent with the jury's verdict. The trial court's order contains the following verdict interrogatory:

> Do you find from a preponderance of the evidence that American Abstract and Title Company, Inc., should receive judgment against Stewart Title Guaranty Company on the claim by American Abstract and Title Company, Inc., for interference with its business expectancies?
>
> Answer: Yes

> This verdict form was then signed by the foreman as a unanimous verdict.

Subsequently, on November 18, 2003, Guaranty filed a motion for judgment notwithstanding the verdict and a motion to reduce the jury verdict. A hearing on both motions was held on

December 12, 2003. At that hearing, Guaranty argued that the jury's verdict should be overturned because Abstract's case was based upon its past relationship with customers, and it failed to present any proof that a business expectancy existed. Abstract argued that Guaranty promoted its business by developing improper marketing schemes. The trial court denied both of Guaranty's motions.

Guaranty's appeal is taken from the trial court's denial of Guaranty's motions for directed verdict, the denial of Guaranty's motion for judgment notwithstanding the jury's verdict, the denial of Guaranty's motion for remittitur of the compensatory and punitive damage awards, and the entry of judgment that reflects the jury's verdict against Guaranty on Abstract's claim for interference with business expectancy.

*I. Tortious interference with business expectancy*

*A. Existence of a "business expectancy"*

For its first point on appeal, Guaranty argues that, as a matter of law, Abstract did not possess a valid business expectancy. Specifically, Guaranty contends that no contract existed between Abstract and third-party real estate companies and their agents. Additionally, Guaranty argues that Abstract's past dealings with customers would not entitle it to a future right of referrals from past customers.

In response, Abstract argues that Guaranty bought business away from other competitors by devising kickback marketing with the full knowledge that these schemes violated the law. Specifically, Abstract maintains that substantial evidence of valid economic expectations was presented to the jury, including testimony from many realtors who described ongoing business relationships with Abstract.

Our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *Ethyl Corp. v. Johnson*, 345 Ark. 476, 49 S.W.3d 644 (2001). Similarly, in reviewing the denial of a motion for JNOV, we will reverse only if there is no substantial evidence to support the jury's verdict and the moving party is entitled to judgment as a matter of law. *Id.* Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* It is not this court's place to

try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

With this standard of review in mind, we turn to the applicable law. In Arkansas, we have recognized the tort of interference with business expectancy. *W.E. Long Co. v. Holsum Baking Co.*, 307 Ark. 345, 820 S.W.2d 440 (1991). In *Mason v. Funderburk*, 247 Ark. 521, 528, 446 S.W.2d 543, 548 (1969), we gave a historical perspective of tortious interference with business expectancy, where we stated:

> Intentional and unjustified third-party interference with valid ... business expectancies constitutes a tort, with its taproot embedded in early decisions in the courts of England ... [T]he tort has become engraved upon American law, generally unsullied in principle ... The fundamental premise of the tort — that a person has a right to pursue his valid ... business expectancies unmolested by the wrongful and officious intermeddling of a third party — has been crystallized and defined in Restatement, Torts Sec. 766."

*Mason*, 247 Ark. at 528, 446 S.W.2d at 548.

To establish a claim of tortious interference with business expectancy, Abstract must prove: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Vowell v. Fairfield Bay Community Club, Inc.*, 346 Ark. 270, 276-77, 58 S.W.3d 324, 329 (2001). In addition to the above requirements, we have stated that for an interference to be actionable, it must be improper. *Hunt v. Riley*, 322 Ark. 453, 909 S.W.2d 329 (1995).

Further, we note that tortious interference with business expectancy is distinguishable from the privilege to compete, which is discussed by Prosser in the following terms:

> In short, it is no tort to beat a business rival to prospective customers. Thus, *in the absence of prohibition by statute, illegitimate*

*means, or some other unlawful element,* a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.

*Kinco, Inc. v. Schueck Steel, Inc.,* 283 Ark. 72, 77-78, 671 S.W.2d 178, 181 (1984) (citing W. Prosser, *Law of Torts,* § 130 (3rd ed. 1971)) (emphasis added).

Guaranty raises the first element of the tort for its first point on appeal: whether a valid contractual relationship or a business expectancy existed. This first element may be proved by demonstrating either a valid contractual relationship or a business expectancy. *Cross v. Arkansas Livestock and Poultry Commission,* 328 Ark. 255, 262, 943 S.W.2d 230, 234 (1997). We note that this element is in the disjunctive by the use of the word *or;* that is, a valid contractual relationship *or* a business expectancy must exist. We further note that no contract between Abstract and third-party realtors was introduced into evidence. Thus, the question is whether Abstract had a valid business expectancy with which Guaranty interfered.

In Arkansas, the existence of a contractual relationship is not a prerequisite to maintain an action for tortious interference with business expectancy. *Mid-South Beverages, Inc. v. Forrest City Grocery Co., Inc.,* 300 Ark. 204, 778 S.W.2d 218 (1989). In *Mid-South Beverages,* we reversed the trial court's dismissal of the complaint, and held that no contractual relationship must exist between the two parties. In reviewing the complaint, we noted that (1) Mid-South had an exclusive agreement with Pepsico to bottle and distribute its beverages in a certain geographic territory; (2) Forrest City Grocery (FCG) had sold and distributed Pepsi within Mid-South's territory; (3) Mid-South's customers were being induced to sever their business relationships with Mid-South and instead make purchases from FCG, causing loss of business to Mid-South; and (4) FCG acted wilfully, knowing its acts interfered with Mid-South's contractual relationships and with its customers. We held that the complaint sufficiently stated a cause of action, and that no contractual relationship had to exist between these parties. *Id.*

■ Further, we held that there was substantial evidence to support a valid business expectancy in *Vowell, supra*. In *Vowell*, the Fairfield Bay Community Club had an agreement with its property owners to provide services and amenities in exchange for a fee. Vowell, a competitor who had extensive knowledge of the Club's practices, as he was a former employee of the Club, began soliciting nonresident Club members to participate in a competing vacation resort. We held that the Club had a valid business expectancy to a stream of dues to be paid with respect to lots purchased by the Club, and given that Vowell previously worked for the club and helped draft deed restrictions for club properties, we held that there was substantial evidence that he intentionally developed a marketing plan to entice club members to sell lots to the competitor. *Id.*; *see also Holsum, supra* (holding that Holsum Baking had a business expectancy with its suppliers because (1) it had been doing business with them for years and (2) the appellant instructed Holsum's suppliers to stop selling Holsum's trademark packaging); *Kinco, Inc. v. Schueck Steel, Inc.*, 283 Ark. 72, 671 S.W.2d 178 (1984) *supra* (holding that there was substantial evidence that Kinco interfered with Schueck's valid business expectancy of supplying metal wall paneling for construction of a school).

■ Thus, in examining the question of whether a valid business expectancy exists, we must look to Prosser for guidance on the definition of "business expectancy." Prosser writes:

> For the most part the "expectancies" thus protected have been those of future contractual relations, such as the prospect of obtaining employment, or employees, or the opportunity of obtaining customers. In such cases, there is a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered.... The cause of action has run parallel to that for interference with existing contracts. Again, the tort began with "malice," and it has remained very largely a matter of at least intent to interfere.... *With intent to interfere as the usual basis of the action, the cases have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it.*

W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 130, at 1006-1009 (5th ed. 1984) (emphasis added).

■ We are also guided by the *Restatement (Second) of Torts*, which provides in pertinent part:

> The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, ... if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts. . . . Also included is interference with a continuing business or other customary relationship not amounting to a formal contract.

*Restatement (Second) of Torts* § 766B, cmt. c (1979). Any prospective business relationship that would be of pecuniary value constitutes a valid business expectancy. *Id.*

■ We have said that some precise business expectancy or contractual relationship must be obstructed. *Country Corner Food and Drug, Inc. v. First State Bank and Trust Co.*, 332 Ark. 645, 966 S.W.2d 894 (1998). In that case, Country Corner alleged in its complaint that the Bank tortiously interfered with its "contract advantage" by giving "assurances" and refusing to renew a loan. We held that Country Corner's cause of action was insufficiently pled in the complaint because the appellant failed to indicate with what contract or with what business expectancy the Bank intended to interfere. *Id.*

With these well-established legal principles in mind, we turn to the present case. First, we look to the complaint to determine if Abstract specifically pleaded that a valid business expectancy existed. Conclusions without the necessary factual underpinnings to support them are not enough to state a cause of action. *Hunt*, 322 Ark. at 459, 909 S.W.2d at 332.

■ Here, in its complaint, Abstract made the following allegations involving Guaranty's interference:

> [T]he illegal acts which are alleged in this complaint constitute interferences with contractual relationships and business expectancies which were held by the plaintiff and which were well known to the defendants, as through honest and fair competition in the economic market over many years, the plaintiff was established in that economic market and held valid, existing economic relation-

ships and justifiable economic expectations, the destruction of which was the intentional and improper motive of the defendants, and the fact the defendants' conduct alleged herein is illegal under the Real Estate Settlement Procedures Act [12 U.S.C. Section 2601, *et seq.*] is evidence of impropriety required under *Mason v. Wal-Mart Stores, Inc.*, 333 Ark. 3, 969 S.W.2d 160 (1998) and as proof, among other things, of the defendants' motive, the illegality of the defendants' activity sought to be advanced, and the absence of a social interest in protecting the defendants' freedom to pursue illegal activities, all considerations required to be assessed under *Mason v. Wal-Mart Stores, Inc.*, and under AMI 404, Arkansas Model Jury Instructions (4th ed. 1999).

Based upon the foregoing allegations, it appears that Abstract sufficiently pleaded that a valid business expectancy existed. Abstract averred that it maintained "valid, existing economic relationships and justifiable economic expectations," with which Guaranty interfered. Additionally, Abstract averred that there were "illegal acts" — acts that did not justify the interference. Those alleged illegal acts to which Abstract refers in its complaint include (1) Guaranty making donations at the directive of Roddy McCaskill; (2) paying the salaries of employees who provided their services as "closing coordinators" to real estate brokerage firms, paying bonuses to those employees, depending on how many referrals of closing services could be steered to STAR, and keeping their customers ignorant of STAR's higher closing costs; (3) alleged kickback schemes through shell corporations made with Real Estate Central, Roddy McCaskill and Truman Ball, Jeff Fuller, Val Hansen, and Rainey Realty; and (4) funding the alleged kickback schemes called "marketing agreements" with Rainey Realty and Real Estate Central by establishing rental agreements that allegedly disguised methods of providing funds in exchange for referrals.

Second, there was substantial evidence to support the jury's verdict. Abstract's allegations regarding the existence of a valid business expectancy were supported by numerous witnesses who testified at trial. Billy Roehrenbeck, a licensed title insurance agent and employee with Abstract, testified that he reviewed numerous Abstract files dating from March 2002 to determine which real estates companies were involved in the closing and whether there was a split closing. Mr. Roehrenbeck prepared Exhibit 5, which shows transactions for Real Estate Central,

Rector Phillips Morse, and Rainey, and he testified that "these are long, long, long term relationships and you see a drop, you know, just like that." Mr. Roehrenbeck further testified that the business with the realty companies "stopped almost overnight." Additionally, Mr. Roehrenbeck testified that in his review of 552 closures at Rainey Realty, there was above $35,000.00 assessed in additional title insurance premiums above what American Abstract would have charged. He further stated that eighty-eight percent (88%) of the buyers and sellers that went through Rainey and were referred to Stewart had a higher title insurance premium than if they had closed with American Abstract. He further testified about his concern about the loss of business that Abstract was experiencing.

Mike Sage, an escrow officer and vice-president of STAR, testified that the realtors control anywhere between fifty percent (50%) to ninety percent (90%) of "where the business scatters." Jim Pender testified about the title insurance business as a "relationship business," and Kay Marris, a closing agent for Standard Abstract and Title Company, testified about the importance of developing relationships with real estate brokers with whom she deals routinely. Additionally, Barbara Swesey, a real estate broker with Adkins, McNeill, Smith, and Associates, testified that she's worked primarily with Abstract for twenty-five years.

Finally, Mr. Bob Adkins, the chief executive officer of Abstract, testified that he knew he was losing business from Rainey, Rector Phillips Morse, and Real Estate Central. He testified:

> I knew something was going on. I didn't know exactly what it was, of course, in the business, you hear things. But it was predicated by American Abstract starting to lose business from three realtors that we have named which is Rainey, RPM, and Real Estate Central. Knowing that was happening, and I knew that something was going on that we were losing business for that reason, specifically, I did not know all of the marketing agreements, the TitleMax program, I did not know what specifically they were.

 Guaranty suggests that the first element of the tort — whether there is a valid business expectancy — is a threshold issue that must be answered before we delve into the remaining elements. However, based upon the holdings in our case law, particularly in *Mid-South Beverages, supra, Vowell, supra, Holsum,*

*supra*, and *Kinco*, *supra*, as well as the definitions of "business expectancy" outlined by Prosser and the *Restatement (Second) of Torts*, we look to the four elements of the tort in their totality to answer the question whether tortious interference with business expectancy should lie.

Further, we note that this issue does not come to us on a 12(b)(6) or summary-judgment appeal where we typically examine matters of law. In determining whether substantial evidence exists, we have stated that we will rely upon two crucial principles to avoid invading the province of the jury. *Unum Life Ins. Co. of America v. Edwards*, 362 Ark. 624, 210 S.W.3d 84 (2005) (citing *Wheeler Motor Co. v. Roth*, 315 Ark. 318, 867 S.W.2d 446 (1993)). First, the court will consider only the evidence favorable to the successful party below. Second, the court will defer to the jury's resolution of the issue unless we can say that there is no reasonable probability to support the version of the successful party below. *Id.*

In the present case, the circuit court properly ruled that the question of whether a valid business expectancy existed was a question for the jury to determine, and we cannot say that the circuit court erred in deferring to the jury's resolution of the issue. *See, e.g., Gill v. Delaware Park, LLC*, 294 F. Supp. 2d 638 (D. Del. 2003); *Ernster v. Ralston Purina Co.*, 740 F. Supp. 724 (E.D. Mo. 1990). Moreover, based upon the foregoing testimony, we conclude that there was substantial evidence to support the jury's verdict on the issue of whether Abstract's business expectancy existed.

### B. *Intent to interfere with business expectancy*

For its second point on appeal, Guaranty argues that there was no substantial evidence that Guaranty and STAR intended to interfere with Abstract's business expectancy. Specifically, Guaranty contends that Guaranty and STAR did not undertake their programs intending to harm Abstract's business. Guaranty maintains that these programs were directed toward real estate companies, namely Rainey Realty, Rector Phillips Morse, and Real Estate Central, that had done little business with Abstract.

Abstract responds, arguing that Guaranty had the intent to interfere with Abstract's business expectancy. Specifically, Abstract contends that Guaranty and STAR commenced an aggres-

sive program to make realtors and home builders title agents through formation of Affiliated Business Arrangements [ABAs] in an effort to control the direction of underwriting in Pulaski County.

We have said that intentional torts involve consequences which the actor believes are substantially certain to follow his actions. *Miller v. Ensco, Inc.*, 286 Ark. 458, 460, 692 S.W.2d 615, 617 (1985). The "tort of interference with contractual relations is similar to other intentional torts 'in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct.' " *City National Bank of Fort Smith v. Unique Structures*, 929 F.2d 1308 (1991) (quoting *Restatement (Second) of Torts* (1977)). Further, tortious interference with business expectancy "has remained very largely a matter of at least intent to interfere . . . and the means by which [the defendant] has sought to accomplish it." W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 130, at 1008-09 (5th ed. 1984).

We now address whether Guaranty and STAR had the intent to interfere with Abstract's business expectancy. Here, the following notes from STAR's board minutes, dated October 18, 2000, were admitted into evidence:

> The Board was updated on local strategies, i.e. ABAs. STAR currently has one TitleMax agent in place — a 2nd one being established and 2-3 more in the works. STAR currently has a marketing agreement in place with the largest real estate company in Central Arkansas and is working with another company to secure a 2nd marketing agreement. Sam suggested that STAR focus much of its advertising dollar on marketing agreements with local companies. All agreed that the key to successful ABA's is having the key people in the proper positions.

These minutes illustrate that Guaranty had knowledge that the TitleMax programs and the marketing agreements were in place.

Mike Harris testified that in 1999, he began to develop methods to generate activity for his title company through associations with various realtors. Mr. Harris stated, "I don't know that there was ever an official stamp of approval," but he admitted that Guaranty had knowledge of it. Additionally, Mike Sage testified that Guaranty had knowledge of the closing coordinators, the use

of the TitleMax programs, the transactions with Val Hansen and Jeff Fuller, and the marketing agreements.

Pivotal testimony came from Mike MacKinder, the principal broker at Rainey Realty. The following colloquy took place:

Q: Regardless of the predominance of American Abstract's involvement of closings with Rainey agent, you knew that there was a, a routine involvement regardless of the amount, you knew that there was a routine involvement.

A: Sure, Rainey's had a relationship with American Abstract for a long time.

Q: For maybe up to thirty (30) years.

A: Possibly, yeah.

. . .

Q: When, would you acknowledge that the negotiations which took place later involving the Title Max negotiations and the negotiations for the Marketing Agreement, both of them were known to have a potential for significant impact on where closings occurred from Rainey?

A: Sure.

Q: All right. And so, if each one of them carried the potentiality [sic] of having a significant impact on closings on the practices, the historical and traditional practices which have occurred, then it would have been known to all participants, would it not, that if there was an increase in Stewart closings on account of the programs being considered, there would by definition be an equal reduction in the amount of other places.

A: Yeah, probably.

Q: And that would include American Abstract.

A: Yes, that's why we gave Mr. Adkins [of American Abstract] first chance.

. . .

Q: Did you, did you discuss the changes in the marketplace that would occur on account of the agreements that you were negotiating?

A: No, we didn't.

Q: You never discussed it?

A: I don't think so. I don't remember discussing anything.

Q: Was it accepted that there would be such a change?

A: I think it was understood.

This testimony, particularly the testimony of Mr. MacKinder, satisfies the second element of the tort because it illustrates (1) that Guaranty had knowledge of Abstract's business expectancy, and (2) that Guaranty had the requisite intent to interfere with that business expectancy through the use of its TitleMax programs, rental agreements, and closing coordinators. Based upon this testimony, we conclude that there was substantial evidence to support the jury's finding that Guaranty knew that its actions would cause harmful consequences to Abstract's business.

## C. Conduct of interfering with business expectancy

For its third point on appeal, Guaranty argues that there was no substantial evidence to support the third element of the tort that Guaranty engaged in improper conduct, which is required to prove interference with business expectancy. Specifically, Guaranty and STAR contend that there is no substantial evidence of a RESPA violation, notably that (1) there was no substantial evidence that Guaranty paid for business referrals and (2) that there was no substantial evidence that Guaranty improperly split settlement service charges.

In response, Abstract argues that the evidence overwhelmingly demonstrates that Guaranty and STAR "directly established a number of patently shell corporations through which RESPA was violated and illegal referral fees were routinely paid."

We require that the defendant's conduct be at least "improper." *Vowell*, 346 Ark. at 277, 58 S.W.3d at 329. In determining whether an actor's conduct is improper, we consider

(1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *Id.*

At issue in this case is whether Guaranty's actions of creating the Title Max programs, the marketing agreements, and the closing coordinators constitutes improper conduct under *Vowell, supra.* With regard to the Title Max programs, Guaranty contends that the jury could have found, at best, that Guaranty's "misstep" would not result in a RESPA violation. However, the testimony at trial illustrates that a RESPA violation may have occurred. Val Hansen, a real estate broker with RE/MAX Properties, testified that he established Pavilion Title and entered into nine or ten transactions in connection with the TitleMax program. He stated that he never asked for any capitalization of Pavilion Title, there never was capitalization of Pavilion Title, there was never any equity developed in the company, and that the net worth of Pavilion was zero when it started and zero when it ended. He further stated that he never designated employees to work at Pavilion Title. Mr. Hansen also testified that he did not have separate offices for Pavilion Title, did not pay any rent anywhere for any space, and did not do any business with any customers other than those who were clients of his real estate company. He admitted that his disclosure let people know that he owned Pavilion Title, but that disclosure did not mention Stewart Title. Mr. Hansen further testified that he signed service agreements in advance. He admitted that he stopped participating in the program when he heard "other people in the industry not speaking favorably about this program."

Jeff Fuller, a real estate broker of Agentonline.realty, testified about his involvement in the TitleMax program and with STAR. He testified that he met with Mr. Harris in January 2001, and upon entering the TitleMax program, he established a company called Pulaski Title LLC. Mr. Fuller stated that the business was a STAR-approved Stewart Title insurer, and that he began and ended Pulaski Title with zero capital investment.

Jim Pender, a former Stewart Title agent and a lawyer who primarily works in the title closing business, testified at length about his discussion with Bill Bozeman, the regional legal counsel

for Guaranty, about Mr. Pender's belief that the Title Max program was illegal under RESPA. Jim Pender testified that TitleMax was a Guaranty company program whereby Guaranty would make an offer to a real estate agent or a mortgage company to become a TitleMax agent, and they would be paid money for the business they received under the TitleMax program. Mr. Pender testified that he believed this program violated RESPA. Mr. Pender further testified that Guaranty did not have much success in the market until it implemented these programs. He further stated that his own business suffered substantial losses after Guaranty implemented these programs.

Finally, Mr. Adkins of Abstract testified that Mr. Rainey brought a copy of the Title Max program to Mr. Adkins, and Mr. Adkins "reviewed it, we shared information among ourselves, had also legal counsel on it, [and] decided it was not the proper thing for us to do, and my opinion, I thought it was inappropriate. I don't think that's a fair playing field for title insurance companies or anyone else to be in."

With regard to Guaranty's marketing agreements with Rainey Realty and Real Estate Central, these programs were established through rental arrangements and split-advertising to hide Guaranty's payments to brokers for referrals. Eugenia Williams, a realtor with Coldwell Banker and former employee at Rainey Realty, testified that she often conducted business with Billy Roehrenbeck at Abstract. She also testified that she routinely used Abstract until she was asked by Rainey to send business to STAR. Ms. Williams further testified that, during one closing, she questioned Mr. MacKinder on whether Stewart should conduct the closing, and Mr. MacKinder "got very upset, very agitated, and almost came forward on the desk."

Mike Harris testified that he placed STAR's closing coordinators with Rector Phillips Morse. Kelli Greenwood, one of STAR's closing coordinators, testified that she was paid separately for each closing. Travis Bailey, the president of Beach Abstract and Guaranty Company, testified:

> Q: And what effect have they [Guaranty and STAR] had on competition, and describing it to the extent that the jury can understand it.
>
> A: If you, if you have an affiliation with someone that potentially can control the transaction, there's not any way you can compete with that.

Q: Would you please explain?

A: If, if a company is associated, for example, with a realtor and that realtor controls normally where that transaction goes to close, then that realtor is not going to send it to a competitor.

Q: Well, why don't you just go in and pay more than the other?

A: We don't pay for our business.

Q: Why not?

A: Because I'm under the impression that's illegal.

Additionally, Grant Mitchell, an attorney with Schlotsky and Buckman in Washington, D.C., and a former HUD senior attorney who has been a long time adviser in real estate matters, including RESPA, testified on the issue of kickbacks in the marketing industry. He stated:

[Kickbacks are] [e]ssentially anything of value. The term of art is a thing of value. If you give anybody a thing of value in exchange for the referral of business, that's a [HUD] violation. Also, a kickback in exchange for giving business, or splitting a fee when you did not perform any service. All these are violations of RESPA.

Thus, in light of the foregoing testimony, the jury discerned that Guaranty engaged in the following conduct: (1) the establishment of the Title Max programs through which shell corporations were formed, (2) entering into marketing agreements with realty companies that allegedly disguised referral kickbacks, and (3) the introduction of closing-coordinator plan through which those coordinators were paid referrals. Therefore, we hold that there was substantial evidence to support the jury's finding that Guaranty engaged in improper conduct as described in *Vowell*, *supra*.

Further, we conclude that Guaranty's conduct is distinguishable from the privilege to compete, as Prosser defines the term. Abstract did not simply "[get] some competition and start[ ] to lose business," as the dissent suggests. Here, the testimony reveals that Guaranty, with knowledge, engaged in allegedly illegal conduct to buy its own customers through the use of shell

corporations, kickback schemes, and referral deals. What Guaranty called an aggressive marketing campaign morphed into what many witnesses viewed as desperate acts of illegality to save a distressed business. This highly improper conduct can hardly be viewed under the auspices of fair advertising or free-market competition.

### D. Damages

For its fourth point on appeal, Guaranty argues that there is no substantial evidence to support the damages awarded to Abstract. In response, Abstract argues that there was substantial evidence to support the damages awarded to Abstract for Guaranty's interference with business expectancy.

Abstract was awarded $500,000.00 in compensatory damages and $500,000.00 in punitive damages. On November 18, 2003, Guaranty filed a motion to reduce the jury verdict, which was denied by the trial court in its order dated December 22, 2003. In its fourth point on appeal, Guaranty appeals the denial of its motion to reduce the jury's verdict.

When an award of damages is alleged on appeal to be excessive, we review the proof and all reasonable inferences most favorable to the appellee and determine whether the verdict is so great as to shock our conscience or demonstrate passion or prejudice on the part of the jury. *Ellis v. Price*, 337 Ark. 542, 551, 990 S.W.2d 543, 548 (1999) (citing *Builder's Transp. v. Wilson*, 323 Ark. 327, 914 S.W.2d 742 (1996). Remittitur is appropriate when the compensatory damages awarded are excessive and cannot be sustained by the evidence. *See Ellis, supra.* The standard of review in such a case is that appropriate for a new trial motion, *i.e.,* whether there is substantial evidence to support the verdict. *Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003) (citing *Johnson v. Gilliland*, 320 Ark. 1, 896 S.W.2d 856 (1995) (citing Ark. R. Civ. P. 59(a)(5) and holding that an error in the assessment of the amount of recovery is grounds for a new trial)).

With this precedent in mind, we turn to jury's award in the present case. Here, Abstract's economics expert, Dr. Charles Venus, testified as to Abstract's damages based on average profits and those losses based on margin profits. According to Dr. Venus, Abstract's lost profits based on an average basis was $614,607.00, and their lost profits based on a marginal basis was $999,033.00.

Dr. Venus further testified that he believed that the marginal-profits analysis was correct. However, Guaranty's expert, Dr. Keith Berry, testified that, after using his data or Mr. Roehren-beck's data, "you're not going to get much more than a hundred thousand ($100,000.00) to a hundred and fifty thousand dollars in losses ($150,000.00)." Abstract argued that Dr. Berry's study was flawed because underlying records and various HUD-1 statements were misinterpreted.

We have said that it is the sole province of the jury to determine not merely the credibility of the witnesses, but the weight and value of their testimony. *Bell v. Darwin*, 327 Ark. 298, 937 S.W.2d 665 (1997). Here, the jury gave weight and value to Dr. Venus's testimony and his belief that marginal profits was the method to determine damages. Because this issue is within the province of the jury, and because we cannot say that the amount of damages shocks our conscience, we cannot say that the circuit court erred in denying Guaranty's motion for remittitur. Accordingly, we affirm the jury's award of damages.

### E. Abstract's cross-appeal

Abstract advances its cross-appeal only as to that part of the jury verdict denying Abstract's claims under the Arkansas Unfair Practices Act found at Ark. Code Ann. § 4-75-202 *et seq.*, or in the event that we reverse and remand for retrial. Because we affirm the jury's verdict, we do not reach the merits of Abstract's cross-appeal.

Affirmed.

CORBIN, J., dissents.

BROWN and IMBER, JJ., concur.

ROBERT L. BROWN, Justice, concurring. I concur with the majority opinion's result but write because of the seriousness of this opinion and the potential for far-reaching consequences as it relates to business competition. In my opinion, the focus for the test needs to be the employment of improper *means* to interfere with American Abstract's economic expectancy and not the *intent* to take away business from a competitor. I agree that improper means were used by Stewart Title and for that reason, I agree to affirm.

In its appeal, Stewart Title contends that more must be shown to prove a business expectancy, which is the first criterion,

than a prior business relationship.[1] And this court has said that a business expectancy must be precise. *See, e.g., Country Corner Food & Drug, Inc. v. First State Bank & Trust Co.*, 332 Ark. 645, 966 S.W.2d 894 (1998). *See also Shank v. William R. Hague, Inc.*, 192 F.3d 675, 689 (7th Cir. 1999) (prospective relationship must be "certain, concrete and definite"). Whether a past business relationship is sufficiently precise or concrete or definite would appear to be a jury question and not one of law. Thus, I disagree with Stewart Title that this issue is solely one of law, and I would affirm the circuit court on this point.

But that takes me to the next three criteria: knowledge of the expectancy by the competing business, intent to interfere, and damage to the plaintiff business in the form of lost profits. Taken alone, these elements are involved whenever legitimate business competition occurs. There is nothing wrong with targeting a customer and employing means to take that customer away from a competing business. It happens every day.

So the essence of our analysis must be the improper *means* used to acquire that business. Otherwise, legitimate business practices would be curtailed.

I turn then to what improper conduct was used by Stewart Title to take away American Abstract's business. The jury was presented with evidence of various schemes which were set in motion to benefit real estate firms that used Stewart Title or referred it business. Arguments were made and evidence was presented that Stewart Title's actions violated the Real Estate Settlement Procedures Act in that it used shell corporations and other devices to pay illegal referral fees. This clearly amounts to substantial evidence of improper conduct. For that reason, I concur that this case must be affirmed.

ANNABELLE CLINTON IMBER, Justice, concurring. The primary issue on appeal is the breadth of the term "business expectancy" for purposes of the tort of interference with a business expectancy. We first adopted the tort of interference with a business

---

[1] The four criteria are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969). Impropriety was added in lieu of malice in recent years. *See Vowell v. Fairfield Bay Community Club, Inc.*, 346 Ark. 270, 58 S.W.3d 324 (2001).

expectancy in the pivotal 1969 case of *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969). In introducing this tort into our case law, we suggested that a broad definition of business expectancy, one that would not require a contract, would be used by this court. We stated, "An existing contract may be a basis for greater protection, but some protection is appropriate against unjustifiable interference with reasonable expectancies of commercial relations *even where an existing contract is lacking.*" *Id.* at 527, 446 S.W.2d at 547 (emphasis added) (quoting *Downey v. United Weatherproofing, Inc.*, 363 Mo. 852, 253 S.W.2d 976 (1953)). The above quoted language reflects that a formal contract would not always be necessary for this tort.

In addition to looking at other jurisdictions for guidance on this new issue, we also looked to the first *Restatement of Torts* § 766 (1939) that states the basic elements for a prima facie case of the tort begin with "(1) the existence of a valid contractual relationship *or* business expectancy . . . ." *Restatement of Torts* § 766B (1939) (emphasis added.) Clearly, under the first Restatement, the tort could be based on either a contractual relationship, or a business expectancy. Unlike the first Restatement, the American Law Institute's 1979 version of the Restatement describes the tort differently. *See Restatement (Second) of Torts* § 766B (1979). Instead of stating that a "contractual relationship or business expectancy" is necessary for a prima facie case, the *Restatement (Second) of Torts* states a "prospective contractual relation" is the necessary relationship for a tortious-interference claim. *Id.* While the new language might appear to effectively eliminate the tort for those parties without a contract, the language from the first Restatement can be found in the commentary to the 1979 version of the Restatement. *See Restatement (Second) of Torts* § 766B, cmt. c. (1979). Comment c describes the "type of relation" that must be established for this tort, stating, "The relations protected . . . include[] . . . interference with a *continuing business or other customary relationship not amounting to a formal contract.*" *Id.* (emphasis added.) Thus, even though we relied on the first Restatement in deciding the *Mason* case, comment c to the *Restatement (Second) of Torts* § 766B still supports a broad non-contractual relationship requirement in tortious-interference claims. For this reason, the controlling authority in Arkansas continues to be the *Mason* court's broad reading of what constitutes a business expectancy. *See Vowell v. Fairfield Bay Community Club, Inc.*, 346 Ark. 270, 58 S.W.3d 324 (2001); *Cross v. Ark. Livestock and Poultry Comm'n*, 328 Ark. 255, 943 S.W.2d 230 (1997); *Mid-South Beverages, Inc. v. Forrest City Grocery Co., Inc.*,

*300 Ark. 204, 778 S.W.2d 218 (1989); Kinco, Inc. v. Schueck Steel, Inc.,* 283 Ark. 72, 671 S.W.2d 178 (1984).

More recently, other jurisdictions have adopted differing approaches on how to define a business expectancy. Some jurisdictions take a narrow, "contract required" approach while others take a broader, "contract not required" approach. For example, the Seventh Circuit Court of Appeals in *Shank v. Hague, Inc.,* 192 F.3d 675 (7th Cir. 1999), concluded that Wisconsin had adopted a narrow view of business expectancy, such that a plaintiff must show at least a "bargained for right" or at a bare minimum a "sufficiently certain, concrete and prospective relationship," with a third party in order to bring a tortious-interference claim. *Id.* at 689. The federal appellate court noted that no Wisconsin court had extended the scope of the tort to cover "continuing economic relations" and "expectation rights in continuing . . . business relations." *Id.* Consequently, the court held that the non-contractual relationship between a sales representative and members of a distribution network was not a sufficiently certain relationship to support a claim for tortious-interference with actual or prospective contracts against a product manufacturer under Wisconsin law.

Some jurisdictions take a broader view of what constitutes a business expectancy. For example, in *Newton Ins. Agency, & Brokerage, Inc. v. Caledonian Ins. Group, Inc.,* 114 Wash. App. 151, 52 P.3d 30 (2002), the Washington Court of Appeals defined business expectancy as including "any prospective contractual or business relationship that would be of pecuniary value." *Id.* (quoting *Restatement (Second) of Torts* § 766B, cmt. c). In this broad view of business expectancy, the Washington court held that an insurance agency had a valid business expectancy in *all* of its customers when its competitor improperly obtained customers through the agency's former employee.

Additionally, the tort of interference with a business expectancy requires that a business expectancy exist and that the alleged interfering conduct be improper. Many courts approach the business-expectancy element and the improper-conduct element on a continuum, with the strength of one element being inversely related to the necessary strength of the other. A contractual business relationship, for example, would not require a high level of interference to establish tortious conduct, whereas a non-contractual business relationship would require more egregious interference. The type of market involved in each case will also be

determinative of the strength of the business relationship required. For example, in *Belden Co. v. InterNorth, Inc.,* 90 Ill. App. 3d 547, 413 N.E.2d 98 (1980), the court held that the possible merger between two companies was only a mere business expectancy because no contractual relationship existed between them. In the absence of a contractual relationship, interference by a third company would have to reach the level of unfair competition because "[w]hen a business relationship affords the parties no enforceable expectations, but only the hope of continued benefits, the parties must allow for the rights of others." *Id.* at 552, 413 N.E.2d at 102. The court noted that "as the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases," suggesting that a non-contractual business relationship is still a valid business expectancy for purposes of the tort, but a more extensive interference is required when there is no contract in the relationship. *Id.*

Similarly, in *Trepel v. Pontiac Osteopathic Hospital,* 135 Mich. App. 361, 354 N.W.2d 341 (1984), the court held that the "social desirability of encouraging competition will justify some actions in an advantageous business relationship case which would be tortious if a contract existed," indicating that a non-contractual relationship requires a higher level of improper interference to reach the level of tortious conduct. *Id.* at 375, 354 N.W.2d at 347. In *Trepel,* Trepel, a radiologist, contracted with a hospital and when the contract had expired, a competing radiologist was given the new contract. The court held that the competing radiologist's behavior did not meet the requisite level of improper conduct to withstand a summary-judgment motion because Trepel had not shown the high level of improper interference required: illegal, unethical, or fraudulent conduct. *Id.* Because the relationship between Trepel and the hospital was not as strong, a higher level of improper conduct was required.

We have recognized this continuum in Arkansas. In *Mason,* this court stated, "The unjustifiable character of the alleged wrongdoer's conduct and the harm caused thereby may be equally clear in both instances, but the differentiation between them relates to the scope of the privileges, or the kind and amount of interference that is justifiable in view of the differences in the facts." *Mason,* 247 Ark. at 527, 446 S.W.2d at 547. According to the above quoted language, it is clear that we do not look at the existence of the business expectancy and the existence of improper conduct as separate elements; instead, we look at these two

elements together. We look at the business–expectancy element and the improper–conduct element on a continuum, with the strength of one element being inversely related to the necessary strength of the other. Consequently, we do not analyze either of these elements independently. Additionally, the type of market must be considered. The nature of the profession and standards of the profession will also determine the type of relationship involved in each case.

In the instant case, the alleged business expectancy was based on long-term business relationships and not on a formal contract, although much evidence was presented at trial regarding the strength of this long-term relationship. Billy Roehrenbeck, a licensed title insurance agent and employee with American Abstract, testified that the relationships in the abstract and title business are "long, long, long term relationships." Jim Pender, owner of First National Title Company, opined that "a title company is a relationship business" and it "takes a long time to build those relationships." Mike MacKinder, a real estate broker at Rainey Realty, acknowledged that he knew Rainey Realty had a relationship with American Abstract "possibly up to thirty years." Barbara Swesey, a real estate broker with Adkins, McNeill, Smith, and Associates, testified that this was a "very ongoing business relationship" and that she had worked with American Abstract for twenty-five years. Bob Adkins, chief executive officer of American Abstract, testified that he lost the business with people that he had worked with "for years and years." He had enjoyed sixty to eighty percent of the business from Rainey Realty for twenty-five years. Finally, Dr. Charles Venus, the economic expert in the case, testified:

> It's a personal market, the people stay in place for a long time, the agents get to know the employees of the companies, companies build their reputation for good service, if they succeed and get a decent market share, then they're providing good service, and you use the same companies over and over because of that good service.

There was ample evidence presented at trial to prove the existence of a long-term relationship between American Abstract and the real estate companies. There was also ample evidence presented to prove that the type of relationship between American Abstract and the real estate companies was the type of business relationship found in this market. In the abstract and title business, relationships are one of the most important aspects of the business.

Therefore, the question of the existence of a business expectancy was properly submitted to the jury.

The strength of the business relationship, however, must be weighed against the strength of the alleged improper conduct. The improper-conduct element of this tort has been defined by the Supreme Court of Tennessee in *Trau-Med of America, Inc. v. AllState Ins. Co.,* 71 S.W.3d 691 (Tenn. 2002). After acknowledging that the determination of whether there has been improper conduct would depend on the particular facts and circumstances of each case, the Tennessee court cited several examples of improper interference:

> (1) those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common law rules, (2) violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship, and (3) methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* at 701. Interference for an improper purpose has also been defined by the Washington Court of Appeals as interference that is "wrongful by some measure beyond the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession." *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Group, Inc.,* 114 Wash. App. at 158, 52 P.3d at 34. Of course, mere interference for the purpose of competition is not enough to warrant a finding of improper conduct. *Trepel v. Pontiac Osteopathic Hospital, supra.*

The improper conduct alleged in this case involved Guaranty's actions in creating the TitleMax programs, marketing agreements, and closing coordinators. From the trial testimony summarized in the majority's opinion, the conduct in the instant case clearly meets the first category of improper conduct under the analysis adopted in *Trau-Med of America, Inc. v. AllState Ins. Co., supra,* and the definition of improper interference under *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Group, Inc., supra.* Ample evidence was presented to show Guaranty's actions were illegal due to violations of statutes or regulations. Testimony was presented that the TitleMax programs violated federal law under the Real Estate Settlement Procedures Act, codified at 12 U.S.C.

§ 2617(a) (1994), and that the referral kickbacks and paid referrals under the marketing agreements violated federal regulations promulgated by the Department of Housing and Urban Development. Thus, there was substantial evidence for the question of improper conduct to be submitted to the jury.

In viewing the instant case on the continuum, the business expectancy between American Abstract and the real estate companies was based on long-term business relationships and not on a formal contractual relationship. Therefore, the level of improper conduct must be higher than if the relationship had been based on a formal contract. The evidence presented at trial showed that the abstract and title business involves long-term relationships. It is the nature of the market. Improper interference with these long-term relationships may not be improper interference in another type of market. Because the relationship was not based on a formal contract, the alleged improper conduct must go beyond mere interference for the purpose of competition. When balancing the strength of the business relationship, the nature of the abstract and title market, and the level of improper conduct presented at trial, there was sufficient evidence for the questions of the existence of a business expectancy and the existence of improper conduct to be submitted to the jury and sufficient evidence for the jury to find that both of these elements existed.

For the above-stated reasons, I concur.

DONALD L. CORBIN, Justice, dissenting. I respectfully disagree with the majority's decision to affirm this case. There are four elements required to establish a claim of intentional interference with a business expectancy: (1) a valid business expectancy; (2) the interfering party must have knowledge of the expectancy; (3) intentional interference with the business expectancy; and (4) damages suffered by the interfered with party. *Vowell v. Fairfield Bay Community Club, Inc.*, 346 Ark. 270, 58 S.W.3d 324 (2001). Additionally, this court has stated that actionable interference must be improper. *Hunt v. Riley*, 322 Ark. 453, 909 S.W.2d 329 (1995). While I agree with the majority that all four elements must be present, I disagree that our case law indicates that impropriety outweighs the examination of all elements individually or that it requires a balancing test. I also disagree that the evidence presented in this case is sufficient on the first element.

Because the first element of the tortious interference with a business expectancy *is* a valid business expectancy, it is vital that

this element be present and supported by the evidence. Prior to this case, there has not been a bright-line rule that can be used to determine what is or is not a valid business expectancy. The majority seeks to define this element by looking to Professor Prosser and the Restatement (Second) of Torts. While this court has looked to Prosser for guidance in prior cases dealing with this tort, I do not feel that we need to resort to such sources here, as there is sound precedent from the Eighth Circuit and the Eastern District of Arkansas.

I see no need to look to Prosser or the Restatement in this case, as I believe that a definition can be established by looking to the Eighth Circuit's decision in *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888 (2005). There, Wash, the plaintiff had an exclusive agreement with the defendant, PDQ, to sell PDQ's car washes. Wash had been in negotiations with Wallis to have Wallis purchase PDQ's products when PDQ decided to revoke the exclusive agreement and deal directly with Wallis. Wash claimed a business expectancy with Wallis that PDQ interfered with. Specifically, Wash alleged that PDQ would have renewed its exclusive agreement, and that Wallis would have accepted Wash's partnership proposal. The court found no evidence to support these claims, stating that it was mere speculation that these things would occur, and that mere speculation does not rise to the level of a valid business expectancy. The court explained:

> The existence of a valid business expectancy will not be found where the facts showed a mere hope of establishing a business relationship which was tenuous. In order to have a claim for interference with a valid business expectancy, it is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with.

*Id.* at 895–896 (quoting *Service Vending Co. v. Wal-Mart Stores, Inc.*, 93 S.W.3d 764, 769 (Mo. Ct. App. 2002)). Thus, because the evidence only showed that Wash had secured PDQ's business in the past, it fell short of establishing that Wash had an expectancy of *future* business.

Furthermore, in *Kidd v. Bass Hotels & Resorts, Inc.*, 136 F. Supp. 2d 965 (2000), the Eastern District Court of Arkansas relied on our holding in *Country Corner* that "[i]t is elementary that some precise business expectancy or contractual relationship be obstructed." *Id.* at 970 (quoting *Country Corner Food & Drug, Inc. v. First State Bank*, 332 Ark. 645, 654, 966 S.W.2d 894, 898 (1998)).

The court explained that "past business relationships with former customers is not 'sufficiently certain, concrete and definite' to establish a cognizable prospective relationship." *Id.* at 970 (quoting *Shank v. William R. Hague, Inc.* 192 F.3d 675, 689-90 (7th Cir. 1999)). In *Kidd*, the plaintiff manufactured and sold furniture. He had previously done business with Holiday Inn franchises, but alleged that after the defendants, a competitor and a Holiday Inn/Holiday Inn Express franchiser, entered into an agreement, he lost sales. The plaintiff did not have any contracts with Holiday Inn franchisees and he based his entire claim upon his expectancy to make sales to Holiday Inn franchisees. Specifically, the plaintiff provided evidence showing his closed orders and invoice amounts for a period of four years, which showed that his sales to Holiday Inns went down during the latter two years. He claimed that this drop was due to the defendants' plan. However, his sales manager could not identify any situation where she sought a sale and actually lost it because of the defendants' actions. The court found that his claim for interference with prospective contractual relationships cannot be supported by evidence of past relationships. The court explained that " '[c]onclusions without the necessary factual underpinnings to support them are not enough to state a cause of action.' " *Id.* at 970 (quoting *Hunt*, 322 Ark. at 459, 909 S.W.2d at 332). In other words, the court found that the existence of past business did not, standing alone, support the existence of future business.

The above cases lay the foundation that a valid business expectancy does not require a contractual relationship per se, but there must be sufficiently certain, concrete, and definite evidence that there is a recognizable and reasonable prospective relationship. Consequently, past business relationships cannot be the sole basis with which to base a business expectancy upon. More bluntly, a plaintiff's conclusions that he would have gotten the business because he had before, without an indication from the prospective client, is not enough to establish a valid business expectancy. This definition is parallel to that developed by the Eighth Circuit, and we should follow this guideline in determining whether a valid business expectancy exists in this case.

Applying these holdings here, the proof is insufficient. In the present case, the evidence did not rise to the level of a valid business expectancy. First, evidence and testimony presented at trial demonstrated that the choice of title companies was with the realtor's client or the realtor. Specifically, Bob Adkins, testifying

on behalf of Appellee, explained that he had not made arrangements with different real estate companies from which he would expect them to send him any of their closings, but rather that he relied on his working relationships to bring in business. This is mere speculation that Appellee was going to continue to get business and does not rise to the level necessary to establish a valid business expectancy.

Secondly, as the majority points out, the title insurance business is a relationship business. Nevertheless, for the purposes of a valid business expectancy there must be more than just a thirty-year presence in the marketplace without competition and more than a history of past referrals and relationships with companies and their agents. To contend a valid business expectancy from this is mere speculation that individuals are going to continue to refer business to the company. This evidence is parallel to that in *Wash Solutions* and *Kidd*, and just as in those cases, it is not sufficient to establish a valid business expectancy.

Other than Prosser and the Restatement, the majority primarily relies on *Mid-South Beverages, Inc. v. Forrest City Grocery Co., Inc.*, 300 Ark. 204, 778 S.W.2d 218 (1989), and *Vowell*, 346 Ark. 270, 58 S.W.3d 324, to establish its view on valid business expectancies. These cases, however, involved contractual agreements. I agree with the majority that "the existence of a contractual relationship is not a prerequisite to maintain an action for tortious interference with business expectancy." However, I find it telling that they rely on cases that deal with actual contractual relationships.

In *Mid-South*, this court was faced with the issue of whether the complaint filed by the appellant stated a cause of action under Ark. R. Civ. P. 12(b)(6). Consequently, this court never examined the four elements beyond the facts alleged in the complaint. Nevertheless, upon a close examination of the facts involved, the relationship allegedly interfered with was of a concrete and definite nature, as Mid-South had an exclusive agreement with Pepsico to bottle and distribute its beverages in a certain geographic territory. The presence of this exclusive agreement is strong evidence that the plaintiff held a precise valid business expectancy more in line with the language from *Wash Solutions* than the broad definition proposed by the majority.

In *Vowell*, like *Mid-South*, there was a prior contractual arrangement involved, namely that all Fairfield Bay property owners were required to pay dues to the Club as part of their deed.

These were specific contractual arrangements that this court viewed as establishing "a valid business expectancy to some stream of dues to be paid" with respect to those lots the appellant interfered with. 346 Ark. at 277, 58 S.W.3d at 329. Rather than analyzing this finding of a clear and precise business expectancy, the majority has chosen to focus on Appellant's intent to interfere. While this is clearly one of the elements of the tort, *Vowell* makes clear that each element of the tort must be present to proceed. Nevertheless, it cannot be ignored that again the finding of a valid business expectancy hinges on a precise recognizable and reasonable prospective relationship.

In sum, these cases are more in line with the valid business expectancy definition I have proposed than that of the majority. Specifically, there must be sufficiently certain, concrete, and definite evidence that there is a recognizable and reasonable prospective relationship, beyond mere speculation based on past business. I believe that we must first determine that a valid business expectancy existed, using a concrete and precise standard, before we can examine the other three elements of the tort.

Frankly, this case seems to hinge on competition.[1] Appellee presented evidence that it has a long history of being one of the main title insurance companies in the area and expected to just continue to be on top, but then they got some competition and started to lose business. While they might have believed they would continue on top and keep getting business from the real estate companies and their agents because they have in the past, this is not a valid business expectancy that can be used as a basis to bring action against Appellant, a competitor. It would be a slippery slope to allow a company to maintain an action for intentional interference with business expectancy against a competitor when the expectancy is based upon its lengthy, monopoly-like presence in the marketplace and history of relationships with area real estate agencies. To do so, would not only open the door to a flood of litigation, but also would stifle competition.

Finally, while the majority and Justice Brown are correct in stating that we should ordinarily defer to the jury's determination on a factual issue, I feel that we cannot defer to the findings of a

---

[1] The majority mischaracterizes our discussion of competition. Here, we are dealing with whether a valid business expectancy exists, not, as the majority indicates, whether conduct was proper.

jury that was improperly instructed. Here, the case should have never reached the jury because the trial court could not give a proper instruction as to what a valid business expectancy is. Even the trial judge recognized this lack of a standard when he stated: "I think also there's a problem and the Supreme Court is going to have to decide it on what the valid business expectancy is" when you have a commercial marketplace. Appellant proffered an instruction that would have defined this term, but the trial court rejected it. Consequently, we cannot defer to a jury that lacked proper guidance or instruction about the first element of the tort.

Based on the foregoing reasons, I must respectfully dissent.