AON RISK SERVICES, INC., of Arkansas *v.*
John MEADORS

CA 06-1231                                    267 S.W.3d 603

Court of Appeals of Arkansas
Opinion delivered November 7, 2007

[Rehearing denied December 12, 2007.]

*Tony L. Wilcox* and *Brandon W. Lacy*; *Orr, Scholtens, Willhite & Averitt, PLC*, by: *Chris A. Averitt*; and *Sidley Austin, LLP*, by: *Robert N. Hochman* and *Jason M. Bohm*, for appellant.

*Eubanks, Baker & Schulze*, by: *J.G. "Gerry" Schulze*; *Welch & Kitchens*, by: *Morgan E. Welch*; and *Cloar Law Firm*, by: *Ralph Cloar*, for appellee.

LARRY D. VAUGHT, Judge. A Pulaski County jury awarded appellee John Meadors $2,509,127.60 on several breach-

of-contract claims against his employer, appellant Aon Risk Services, Inc., of Arkansas ("ARS Arkansas"). In post-trial proceedings, the circuit judge reduced the award to $1,281,930.90. The judge also gave Meadors $150,000 in attorney fees, to be increased to $320,482.72 in the event of an appeal, and declined Meadors's request for prejudgment interest. ARS Arkansas appeals, arguing that the jury's verdict was not supported by substantial evidence and that the trial judge erred in subjecting it to an enhanced attorney-fee award should it decide to appeal. On cross-appeal, Meadors asks us to reinstate the jury's original damage award, grant him prejudgment interest, and reverse several summary judgments that were entered prior to trial. We affirm in part and reverse and remand in part on both direct and cross-appeal.

*Background Facts*

Meadors is a veteran of the insurance-brokerage industry. On May 1, 1997, he executed a five-year employment contract with ARS Arkansas, a Little Rock insurance brokerage firm whose parent company is Aon Corporation. ARS Arkansas's managing director, Mark Brockington, described Meadors's job as that of a producer, meaning that he was responsible for attracting business and making sales. The contract provided that Meadors would be compensated by a base salary plus an annual bonus calculated on a percentage of new, first-year commissions earned and collected by ARS Arkansas.

For twenty-five to thirty years prior to 1997, Meadors cultivated a business relationship with Dillard's department stores in hopes of brokering insurance benefits for Dillard's employees. His patience was rewarded in the fall of 1999, while he was employed at ARS Arkansas. In August and September of that year, he put Dillard's in touch with Combined Insurance Companies, another subsidiary of Aon Corporation. Combined offered a package called Workplace Solutions in which Dillard's employees could purchase life, disability, and other types of insurance policies through workplace enrollment. Dillard's and Combined ultimately executed a five-year agreement on March 24, 2000, giving Combined access to Dillard's employees for that length of time.

Before the agreement was signed, however, Meadors obtained a copy of what is referred to as the "Interdependency Memo." This document, dated February 9, 2000, was sent by Aon to all Aon Risk Services Managing Directors, including Mark

Brockington at ARS Arkansas. Its intent was to promote "inter-dependency" among Aon entities, that is, to encourage ARS brokerage offices to place insurance business with Aon-affiliated companies. The Memo recited the following:

> [A] financial rewards system has now been put in place with almost all Aon companies. ARS Management has agreed with the various Aon companies listed on the following page that it will receive from these companies bonus pool monies representing the listed percentage of interdependence revenues generated on new fees and commissions.

(Emphasis in original.) The following page was headlined "Interdependency Compensation Agreements for 2000," and it listed, among others, Combined Insurance Companies. Combined agreed to pay "30% of annualized premium on all life products over 15 year term plus 15% 1st year for all other products to pool." The Memo then explained how the bonus pool would operate:

> Such funds will be paid out in entirety to ARS staffers in the form of annual bonus pool payments under the following conditions:
>
> 1. The Aon Company will credit these monies to the ARS office(s) practice group(s) as appropriate to their involvement in the procurement of revenue.
>
> 2. The credit is made as the income is booked and, if not booked on the accrual method, for 12 full months of income booking.
>
> 3. No formulaic bonus will be accrued to any individual ARS employee.
>
> 4. Each office/practice group will accumulate its "bonus pool" through year end at which time each Managing Director will allocate 100% of the fund balance in the pool to those employees who have been the most responsible for the *professional* production and/or marketing, servicing and/or maintenance of the client accounts generating the bonus pool funds and who have done so in a manner consistent with Aon's stated policies of professional excellence, cooperative behavior, and ethical conduct.
>
> 5. Shared introduction with an office/practice or between and office/practice generates a single payment only. Which may be split as agreed by the MDs [Managing Directors].

6. Each Managing Director's recommendation as to the allocation of the bonus funds in the pool is subject to sign off by the President or CEO of ARS Americas for audit purposes, but the Managing Director's recommendation will not be altered without assumed "extreme prejudice." In any case, the entire pool in each office or practice will be paid.

On a quarterly basis we will share the bonus pool figures with ARS professional staff so that employees are aware of the magnitude of the rewards accruing to them from serving client needs via interdependence efforts.

(Emphasis in original.) Additionally, the Memo declared that "local/practice group management is now authorized to make the proper call 'on the ground' as to just how to allocate bonus monies." Managing Directors were asked to "carefully discuss this enhanced compensation structure with all professional staff" and to "share this message as soon as possible."

According to Meadors, when he saw the Memo sometime in February 2000, he was enthused about the program and "absolutely" believed that it would entitle him to compensation over and above his basic employment contract compensation. However, after the Dillard's/Combined agreement was signed in March 2000, Combined placed no monies in the bonus pool based on Dillard's premiums. Mark Brockington explained that, in order for Combined to acquire the Dillard's account, it had to buy out another broker or insurance company for $1.6 million. Thus, Combined told him, it could not pay normal commissions. Following negotiations that lasted well beyond the signing of the Dillard's agreement, Combined and ARS Arkansas agreed to a $240,000 commission, of which Meadors received fifteen percent, or $36,000, as called for in his basic employment contract.

In 2005, Meadors sued ARS Arkansas, Combined, and several other Aon companies, alleging that the Interdependency Memo was a unilateral contract, which was breached when he did not receive bonus-pool monies generated by the Dillard's agreement.[1] Combined and the other Aon entities were dismissed by summary judgment, as were Meadors's claims for unjust enrich-

---

[1] Meadors first filed suit in 2002. He non-suited his case in 2004 and re-filed it in 2005.

ment, fraud, and breach of contract as a third-party beneficiary. However, the case against ARS Arkansas went to trial. There, Meadors testified that, had the appropriate monies been placed in the bonus pool, he would have received $2,406,522.60 on the Dillard's transaction. The jury awarded him that amount, plus additional damages based on other claims. In post-trial proceedings, the trial judge reduced the Dillard's award by almost fifty percent. This appeal followed.

We begin our discussion of the issues with ARS Arkansas's direct appeal from the jury's verdict pertaining to the Dillard's transaction and Meadors's cross-appeal from the trial judge's reduction of the damages on that same transaction.

## I. Formation of Contract

ARS Arkansas argues that the Interdependency Memo did not form a contract because: 1) it was not sufficiently definite to constitute an offer; 2) if it was an offer, Meadors did not accept it; 3) if a contract was created, it was not an agreement between ARS Arkansas and Meadors. ARS presents these arguments in the context of the trial court's denial of its motion for a directed verdict. Our standard of review is therefore whether the jury's verdict was supported by substantial evidence. *Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

Meadors's theory at trial was that the Interdependency Memo formed a unilateral contract. There are several instances where unilateral contracts commonly appear, such as where a reward is offered, *e.g.*, *Ark. Bankers' Ass'n v. Ligon*, 174 Ark. 234, 295 S.W. 4 (1927), where a contest is announced, *e.g.*, *Mears v. Nationwide Mut. Ins. Co.*, 91 F.3d 1118 (8th Cir. 1996), or where changes are made and disseminated in an employee manual. *See Crain Indus., Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991). In those situations, the offeree does not accept the offer by express agreement but by his performance. For example, in the case of a reward, the offeree accepts by performing the particular task, such as the capture of a fugitive, for which the reward is offered. Even though he has not directly communicated his acceptance, a con-

tract is formed as the result of his performance. *See Ligon, supra. See also* JOSEPH M. PERILLO, CORBIN ON CONTRACTS, § 1.23 (Rev. Ed. 1993); 17 C.J.S. *Contracts* § 9 (1999) (recognizing that a unilateral contract is composed of an offer that invites acceptance in the form of actual performance); 17A AM. JUR. 2D *Contracts* § 5 (2d ed. 1991) (stating that, if performance occurs, then the offer has been accepted, and a contract is formed). The performance also constitutes consideration for the contract. 17A AM. JUR. 2D *Contracts* § 5.

## A. Definiteness of offer

ARS Arkansas argues first that the Interdependency Memo was not sufficiently definite to constitute an offer for a unilateral contract. An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is invited and will conclude it. *ERC Mtg. v. Luper*, 32 Ark. App. 19, 795 S.W.2d 362 (1990), *overruled in part on other grounds by Mosley Mach. Co. v. Gray Supply Co.*, 310 Ark. 448, 837 S.W.2d 462 (1992). An offer cannot be accepted so as to form a contract unless the terms are reasonably certain. *Restatement (Second) of Contracts* § 33 (1981); *see also Luper, supra.* Not every utterance of an employer is binding. *Crain Indus., supra* (quoting *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983)). To bind the employer, an offer must be definite in form and must be communicated to the offeree. *See Hardie v. Cotter & Co.*, 849 F.2d 1097 (8th Cir. 1988); *Dumas v. Kessler & Maguire Funeral Home, Inc.*, 380 N.W.2d 544 (Minn. Ct. App. 1986). Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, and not by their subjective intentions. *Hardie, supra.* The principal issue is whether the employer's statements are intended as an offer and accepted as such or are merely statements of policy and practice. *Id.*

ARS Arkansas contends first that, because the trial court determined that the Interdependency Memo was ambiguous in some respects, it was too indefinite to constitute an offer. We disagree that an ambiguous offer is necessarily indefinite. A writing that is indefinite is incomprehensibly vague or incapable of being understood, *see Barnes v. Barnes*, 275 Ark. 117, 627 S.W.2d 552 (1982), and such indefiniteness is an impediment to the formation of a contract. *See Mgmt. Comp. Servs., Inc. v. Hawkins, Ash, Baptie, & Co.*, 206 Wis. 2d 158, 557 N.W.2d 67 (1996). But, ambiguity does not prevent the formation of a contract; rather, it calls for

interpretation of a contract. *See id.* An ambiguous writing may be understood and enforced by applying the rules of contract construction. *See generally Smith v. Farm Bureau Mut. Ins. Co.*, 88 Ark. App. 22, 194 S.W.3d 212 (2004); *see also Shibley v. White*, 193 Ark. 1048, 104 S.W.2d 461 (1937) (recognizing that, while a contract was ambiguous, it was not uncertain). We therefore see no error in the trial court's refusal to grant a directed verdict on this basis.

■ ARS Arkansas also argues that the Interdependency Memo lacked definiteness, because it merely expressed general concepts of teamwork and provided for judgment calls in the allocation of bonus-pool money. ARS cites several cases in which statements by employers were deemed too indefinite to constitute an offer. *See Hardie, supra* (holding that a statement by the employer's representatives that, if workers voted out the union, the employer would treat them as if a union contract remained in effect, was too indefinite to place restrictions on job terminations); *Crawford v. Gen. Contract Corp.*, 174 F. Supp. 283 (W.D. Ark. 1959) (holding that a promise to "stick by" a person fell short of a promise to finance him for an indefinite period of time without regard to conditions and circumstances); *Mettille, supra* (holding that statements in a company handbook that employment in the banking industry was very stable and that job security was one reason why so many bank employees had five or more years of service were general statements of policy rather than promises of employment for a particular period of time); *Dumas, supra* (holding that a supervisor's statement to an employee that they would "retire together" did not alter the employee's at-will employment status). We believe that the Memo contains terms far more definite than these vague statements. The Memo expressly states that "a financial rewards system has now been put in place." It also sets out specific percentages of amounts to be contributed to the bonus pool by each participating Aon entity, and it contains the precise means by which those pool funds will be distributed to ARS staffers. It is therefore more than a mere statement of policy or a vague promise regarding future events.

■ ARS also relies heavily on *Martens v. Minnesota Mining & Manufacturing Co.*, 616 N.W.2d 732 (Minn. 2000), but it is also distinguishable. There, the Minnesota court held that a brochure touting equal compensation for technical and administrative employees was too indefinite to constitute an offer. The court noted

that there was no suggestion that an individual would be entitled to specific pay, benefit level, or condition of employment, nor were there any criteria to determine when the rights to any benefits had been breached. Further, the prerogative to make decisions as to individual employee promotions, salaries, and so forth was clearly reserved to management based on an evaluation of the individual. By contrast, the Interdependency Memo in this case does not merely set out general goals and philosophies of compensation. It sets out specific percentages of premiums that will go into the bonus pool as part of an "enhanced compensation structure." And, while no employee is entitled to a "formulaic" bonus and Managing Directors may decide how to allocate the bonus pool among their employees, their discretion is not unfettered. For example, managers cannot withhold payment of the pool amount; the Memo provides that the entire pool must be distributed annually. Thus, the mere inclusion of possible judgment calls by management as to the manner of distribution among its employees does not, under these circumstances, render the Memo too indefinite to operate as an offer for a unilateral contract.

## B. Acceptance of offer

ARS Arkansas claims that, even if the Memo constituted an offer, Meadors did not accept it. ARS first cites *MDH Builders, Inc. v. Nabholz Construction Corp.*, 70 Ark. App. 284, 17 S.W.3d 97 (2000), which states that, to create a binding contract, an acceptance must unconditionally agree to all the material provisions of the offer. ARS contends that Meadors did not unconditionally agree to the provisions of the offer because he testified as follows:

> QUESTION: When you received this document [the Memo], did you ever unconditionally agree to its terms?
>
> MEADORS: That was not a conscious thought that I had when I — the first time I looked at that.
>
> QUESTION: And so whether it's when you received it in February or whether you received it in April, that's never a decision you made to unconditionally agree to the terms of [the Memo]?
>
> MEADORS: Not in that, no, I didn't think about that.

ARS's reliance on *MDH* is misplaced. The language in *MDH* does not lend itself to a unilateral contract, which is accepted by performance rather than by express agreement. Additionally,

the point we were making in *MDH* was that an acceptance cannot vary the terms of the offer. There is no claim that Meadors attempted to vary the terms of the Memo. In any event, we believe that ARS reads too much into Meadors's statement that when he first saw the Memo, he simply did not think about whether he unconditionally agreed to its terms.

■ We turn now to ARS's contention that Meadors could not have accepted the offer in the Interdependency Memo because, by the time he learned of the Memo, he had already performed his brokerage task of referring Dillard's to Combined as a client. A unilateral contract is not formed where a party's performance is not made "on the faith of" the offer or "in consequence of" the offer. *See Ligon, supra.* However, unless the offeror manifests a contrary intention, an offeree who learns of an offer after he has rendered part of the performance requested by the offer may accept by completing the requested performance. *See Restatement (Second) of Contracts* § 51 (1981). Meadors contends that, even though he began brokering the deal between Dillard's and Combined before the Memo was in existence, he did not complete performance until after he received the Memo. Thus, he claims, he accepted the Memo's offer. We agree that substantial evidence supported the jury's verdict on this point.

There was evidence at trial that Meadors was aware of the Memo before the Dillard's/Combined deal was finalized in March 2000. ARS managing director Mark Brockington testified that he assumed that he received the Memo on or about February 9, 2000, and he agreed that it directed him to share its message with his eligible professional staff, which would have included Meadors. Meadors testified that he obtained a copy of the Interdependency Memo from Combined Insurance Companies in February 2000, although he did not receive a copy directly from ARS Arkansas until April or May 2000. There was also evidence from which the jury could have concluded that Meadors continued or completed his performance on the Dillard's account after learning of the Interdependency Memo. Combined Insurance Companies executive Heather Gardere said that Meadors played a role in the Dillard's transaction other than the initial referral. She also said that he was involved in the coordination of the overall strategy, the sales process, and was ultimately responsible for the overall relationship. Neil Mayfield, who worked for the enrollment division of Combined, said that Meadors called him after the contract had been signed, asking how the enrollments were going. Moreover,

the Interdependency Memo provided that bonus-pool monies would go to employees who were responsible not only for production of accounts but for servicing and maintaining accounts.

■    Though the evidence on this point is spare, it was the jurors' prerogative to believe or disbelieve it and to accord it whatever weight and value they deemed appropriate. *See generally Stewart Title, supra.* Our task on appeal is not to substitute our view of the evidence for the jury's but to determine whether the jury's verdict was supported by substantial evidence. *See Rathbun v. Ward,* 315 Ark. 264, 866 S.W.2d 403 (1993). With that standard to guide us, we cannot say that ARS Arkansas was entitled to a directed verdict on this point.

## C.  Parties to the contract

■    Finally, ARS Arkansas argues that neither it nor Meadors is named in the Memo and, therefore, the Memo does not constitute a contract between them. However, the Memo imposed certain duties on ARS Arkansas, as it did on all ARS offices, such as accumulating bonus-pool monies and distributing them to deserving employees. And, as already discussed, the Memo was accepted as a unilateral contract by Meadors, thereby making him a party to it. There was, therefore, substantial evidence from which the jury could conclude that Meadors and ARS Arkansas had rights and obligations under the Memo.

## II.  Breach of Contract

ARS argues next that, assuming the Memo formed a contract, there was no substantial evidence that ARS breached the contract. It points out that no bonus-pool money was sent to it on the Combined/Dillard's deal and, therefore, it had no money to distribute to Meadors. Thus, it could not have committed a breach.

When performance of a duty under a contract is due, any non-performance is a breach. *Restatement (Second) of Contracts* § 235(2) (1981). As the jury was instructed in this case, every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. *Cantrell-Waind & Assocs. v. Guillaume Motorsports,* 62 Ark. App. 66, 968 S.W.2d 72 (1998) (quoting *Restatement (Second) of Contracts* § 205). Moreover, a party has an implied obligation not to do anything that would

prevent, hinder, or delay performance. *See generally Commerical Bank of N. Ark. v. Tri-State Propane*, 89 Ark. App. 272, 203 S.W.3d 124 (2005).

■ We believe that there was substantial evidence to support the jury's conclusion that a breach occurred. ARS Arkansas knew that Meadors was eligible to participate in the enhanced-compensation program described in the Memo. It was also aware, or should have been aware from reading the Memo, that Combined had agreed to deposit a certain percentage of premiums into the bonus pool and that ARS Arkansas, as a local office, would be obligated to distribute the pool money. Yet, ARS Arkansas negotiated with Combined Insurance Companies to receive a reduced commission, and much of the negotiating process took place long after the Interdependency Memo was issued, into 2001 when the large amount of revenue attributable to the Dillard's account was known. The jury may well have determined that ARS's acceptance of a lesser commission from Combined was a bad-faith hindrance of the bonus-pool process, which prevented money from being placed in the pool and, thus, prevented it from being distributed to Meadors. Again, the presence of substantial evidence means that we cannot say that the trial court was required to grant a directed verdict on this point.

### III. Damages—Dillard's Transaction

The jury awarded Meadors $2,406,522.60 with respect to the Dillard's transaction. ARS Arkansas argues that, assuming that a contract was formed and that ARS Arkansas breached the contract, Meadors did not produce competent evidence to support that damage award. Meadors cross-appeals from the trial court's reduction of his Dillard's damages to $1,255.825.90. Although damages other than those attributable to the Dillard's transaction are discussed in Meadors's cross-appeal, for the moment we limit our consideration to the Dillard's award.

Meadors calculated his damages on the Dillard's transaction by using information sent to him by Neil Mayfield of Employee Benefit Services, the enrollment arm of Combined Insurance Companies. Mayfield initially sent Meadors a summary of Dillard's enrollment numbers for 2000 and 2001, broken down by categories of insurance. Later, following a deposition, Mayfield provided Meadors with the same type of calculations for 2002, 2003, and 2004. Using Mayfield's charts, Meadors determined which premi-

ums fell under Combined's thirty-percent obligation in the Interdependency Memo and which fell under the fifteen-percent obligation. He then arrived at $2,406,522.60 as the amount he would have received over the five-year life of the Dillard's/Combined contract had the money been placed into the bonus pool. Regarding the year 2000 in particular, which will be at issue under this point, Meadors relied on Mayfield's figure of $4,174,421 as total premiums for that year and, applying the thirty-percent and fifteen-percent figures, came up with $831,873 owed him for that year.

ARS Arkansas argues first that Meadors did not produce reliable evidence of his damages for the year 2000. It cites Mayfield's deposition testimony that, with regard to the printed summary that he sent to Meadors for the year 2000, he did not know where he got it, he did not know who generated it, and he did not verify its accuracy before sending it to Meadors. The trial court, in a post-trial ruling, agreed with ARS that the 2000 summary sent by Mayfield "should not have been submitted to the jury" and, using a different trial exhibit, reduced Meadors's 2000 damages from $831,873 to $622,694.

We believe that the trial court erred in reducing the damages. Two trial exhibits, other than the chart sent by Mayfield, show year 2000 revenues for Combined (Worksite Solutions) attributable to the Arkansas office in the amount of $4,178,888, which is very close to the $4,174,421 figure contained in Mayfield's chart. Further, Heather Gardere of Combined Insurance Companies testified that the $4,178,888 figure represented the premium written though the Arkansas office for Combined (Worksite Solutions) and that most of it was the Dillard's deal. Additionally, Greg Golden, the Chief Operating Officer of ARS Arkansas, sent a letter to ARS of the Americas in 2002 in which he relied on Mayfield's report to state that year 2000 revenues were $4,174,000 and that, if Meadors were compensated under the Interdependency Memo, he would receive $834,800 for that year, which is very close to the $831,873 calculated by Meadors. Finally, Mayfield, after testifying that he did not know where he got the 2000 summary sheet, agreed that, at the time he sent his communication to Meadors, he believed that everything he was communicating was true and accurate. There is certainly no dispute that Mayfield was, at the time he sent the information to Meadors, an employee of the enrollment division of Combined. Based on these

factors, the jury was within its province in determining that Meadors's year 2000 damage calculation was accurate and reliable.

Further, even if, as ARS contends, Meadors produced only an approximate amount of his damages for the year 2000, the jury obviously believed it was a reasonably good approximation. Arkansas law has never required exactness of proof in determining damages, and, if it is reasonably certain that some loss occurred, it is enough that damages can be stated only approximately. *Bank of Am. v. C.D. Smith Motor Co.*, 353 Ark. 228, 106 S.W.3d 425 (2003). The fact that a party can state the amount of damages he suffered only approximately is not a sufficient reason for disallowing damages if, from the approximate estimates, a satisfactory conclusion can be reached. *Id.*

■ We consequently conclude that the trial court erred in remitting Meadors's damage award for the year 2000. While remittitur is appropriate when the compensatory damage award cannot be sustained by the evidence, *United Ins. Co. of Am. v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998), a trial court may not substitute its judgment for the jury's when there is a basis in the evidence for the award and when there is no evidence, appropriately objected to, that tends to create passion or prejudice. *Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285 (1996). *See also McNair v. McNair*, 316 Ark. 299, 870 S.W.2d 756 (1994).

■ ARS argues further that Meadors should have been awarded no damages for the years 2001 to 2004 because the Interdependency Memo states that its agreements apply "only to New Revenue Generated in 2000." There was no trial testimony regarding the meaning of the term "generated," but it ordinarily means to cause to be or to bring into existence. *Webster's Third New Int'l Dictionary* 945 (1993). Given that common-sense definition, we cannot say that the jury's damage award for the years 2001 to 2004 is unsustainable. The Interdependency Memo could be interpreted to mean that, if a multi-year contract were signed in 2000, then the entire amount of revenue produced over the life of the contract was generated or "brought into existence" in 2000.

■ ARS's next argument concerns the term "annualized premiums." The Interdependency Memo provided that Combined agreed to place into the bonus pool thirty percent of "annualized premium on all life products over fifteen year term." ARS claims that Meadors produced no evidence that the premium

figures on which he relied for his 2001 to 2004 damages were annualized premiums. We disagree. Meadors defined an annualized premium as a "premium for a full year," and the figures contained in Neil Mayfield's 2001 to 2004 calculations refer to "annual premiums." Although Meadors testified that he was "guessing" that Mayfield's calculations were based on annualized premiums, Mayfield's numbers speak for themselves, and the jury may have concluded that the 2001 to 2004 figures represented premiums for a full year.[2]

Additionally, ARS argues that all of Meadors's damage calculations were wrong because they included premiums for a company that was not listed on the Interdependency Memo — Provident Unum. While ARS is correct that Provident-Unum premiums were included, as Neil Mayfield explained, in states where certain products were not approved for Combined to sell "we used Provident." From this testimony, the jury may have concluded that a Unum Provident product fell within the umbrella of Combined Insurance Companies.

Based on the foregoing analysis, we affirm the jury's verdict in favor of Meadors for breach of a unilateral contract and reinstate the jury's damages award of $2,406,522.60 pertaining to the Dillard's account.

### IV. Attorney Fees

After trial, Meadors's attorneys presented fee petitions based on hourly rates totaling approximately $200,000. They also provided the court with their employment contract with Meadors, which called for them to receive forty percent of all sums recovered if the case went to trial. The trial judge awarded Meadors fees of $177,500, although in a corrected judgment filed later that same day, the amount was stated as $150,000. However, the judge declared that, in the event that ARS Arkansas appealed, the fee would be increased to $320,482.72.

ARS now argues that Arkansas law does not permit a trial court to enhance an attorney-fee award based on the opposing party's decision to appeal. It cites the factors to be considered in

---

[2] Our disposition of this issue makes it unnecessary for us to reach Meadors's argument on cross-appeal that the trial court erred in excluding certain evidence regarding annualized premiums.

making an award of attorney fees that our supreme court set out in *Chrisco v. Sun Industries, Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990), and notes that a party's decision to appeal is not included among them. ARS also cites *Roberts v. Roberts*, 226 Ark. 194, 288 S.W.2d 948 (1956), where our supreme court held that a trial court cannot condition a party's right to appeal on his first paying an attorney fee.

We review a trial court's award of attorney fees for an abuse of discretion. *Newcourt Fin. v. Canal Ins.*, 67 Ark. App. 347, 1 S.W.3d 452 (1999). However, because we have reinstated a substantial portion of the jury's verdict, rather than review the trial court's fee award, we reverse and remand for the trial court to reconsider the award. Upon remand, the trial court may take into account the time and effort spent on appeal. But we take this opportunity to voice our doubt that an enhanced fee award, employed as a prior restraint on a party's right to appeal, would lie within a trial court's discretion.

### V. Prejudgment Interest

The trial court refused to award Meadors prejudgment interest on his recovery, and he cross-appeals from that ruling.

Prejudgment interest is allowable where the amount of damages is definitely ascertainable by mathematical computation, or if the evidence furnishes data that makes it possible to compute the amount without reliance on opinion or discretion. *Ray & Sons Masonry Contr. v. U.S. Fid. & Guar. Co.*, 353 Ark. 201, 114 S.W.3d 189 (2003). If a method exists for fixing the exact value of a cause of action at the time the event that gives rise to the cause of action occurs, prejudgment interest should be awarded. *Nationsbanc Mtg. Corp. v. Hopkins*, 82 Ark. App. 91, 14 S.W.3d 757 (2003).

In this case, a five-year agreement was brokered between Dillard's and Combined, and the Interdependency Memo set forth specific percentages of Combined premiums that were to be placed in the bonus pool. A method therefore existed by which Meadors's damages could be computed without reliance on opinion or discretion. ARS claims, however, that discretion played a part in determining how much of the bonus pool it would have distributed to Meadors, given that the Interdependency Memo vested local managing directors with discretion in allocating the pool money. While that discretion may have proved

relevant if two or more ARS Arkansas staffers had been responsible for the Dillard's transaction, that was not the case here. Mark Brockington agreed that Meadors was the producer on the Dillard's account. Further, there was no evidence that any other ARS office or any other ARS Arkansas employee was responsible for the Dillard's/Combined transaction. Additionally, the Memo required the managing director to distribute one-hundred percent of the money in the bonus pool. Thus, Brockington could not have employed discretion in allocating the bonus money to anyone other than Meadors. We therefore reverse and remand to allow the trial court to calculate an award of prejudgment interest.

## VI. Other Damage Awards

Meadors's complaint also sought damages against ARS Arkansas for breach of contract concerning a JB Hunt account and for unpaid compensation under his basic employment contract. The jury awarded him $40,500 on his JB Hunt claim and $59,000 in unpaid compensation. After trial, the circuit judge reduced the JB Hunt award to zero and the unpaid compensation award to $23,000. Meadors argues on cross-appeal that these reductions were erroneous, but we affirm them. The jury also awarded Meadors $3105 under the Interdependency Memo for business he placed with another Aon entity listed in the Memo, Cambridge. The trial judge refused to reduce that award, and ARS asserts error, but we affirm that ruling as well.

Regarding the JB Hunt account, Meadors developed an arrangement in which Aon entities reviewed Hunt's employee-benefit plans and made recommendations in exchange for a consulting fee. Hunt eventually paid a fee of $355,000. However, ARS Arkansas received only $85,000. According to Mark Brockington, the remaining money went to the other Aon entities that participated in the consultation. Pursuant to his employment contract with ARS, Meadors received fifteen percent of the $85,000 that ARS Arkansas collected, for a total of $12,750. However, Meadors argued at trial that he was entitled to fifteen percent of the entire $355,000, which would have totaled $53,250. He therefore asserted a claim for the $40,500 difference. The jury awarded him $40,500, but the circuit judge reduced the verdict to zero based on a finding that Meadors received all that was due him under his employment contract. The trial court's ruling was correct. It was undisputed that ARS Arkansas received $85,000

from the JB Hunt transaction. Meadors's employment contract provided that he would receive fifteen percent of first year commissions "earned and collected" by ARS Arkansas. Because ARS collected $85,000, Meadors was fully compensated by receiving fifteen percent of that amount, or $12,750.

██ ██ Meadors also sought compensation of $59,000 under his employment contract, separate and apart from the Interdependency Memo. This figure was based on a 2002 calculation by Chief Operating Officer Greg Golden concerning amounts owed to Meadors as Meadors was nearing the end of his five-year employment period. Golden determined that Meadors was due $59,000 in additional salary, based in part on revenues earned by ARS in the Dillard's transaction. The jury awarded Meadors $59,000, but the trial court correctly reduced it to $23,000, based on undisputed testimony that Meadors received $36,000 as a standard commission from ARS Arkansas on the Dillard's deal.

Finally, ARS argues that there was no substantial evidence to support a damage award on Meadors's transaction with Cambridge. The jury awarded Meadors $3105 based on a 2002 memo in which Greg Golden stated that Meadors "did a deal with Cambridge in 2001 — it is not fully paid yet." The memo further stated that Meadors was owed $3105. In light of this memo, we find no error in the trial court's refusal to remit that award.

*VII.  Summary Judgments Granted to Other Aon Entities*

Meadors's complaint named as defendants six Aon entities other than ARS Arkansas: ARS of the Americas, ARS of Missouri, Aon Corporation, Combined Insurance Companies, Aon Risk Management, and ARS Illinois. The trial court granted summary judgment in favor of all defendants except ARS Arkansas and ARS Illinois.[3] Meadors now argues that these grants of summary judgment were in error. We affirm the summary judgments against all entities other than Combined Insurance Companies.

██ At various points, Meadors's complaint refers to the entities other than Combined and speculates on their involvement with the Interdependency Memo and other aspects of the case.

---

[3] Meadors's case against ARS Illinois went to trial on one particular transaction. He was awarded $45,500, and ARS Illinois satisfied that judgment. It is not at issue on appeal.

However, the complaint does not state facts that show that these entities participated in any breach or other conduct that led to Meadors's damages. Moreover, upon being faced with summary judgments, Meadors was likewise unable to satisfactorily explain his inclusion of these entities as defendants or create a material question of fact as to why they should remain in the case. And finally, in his appellate brief, Meadors makes no convincing argument that the trial court erred in granting summary judgment to these companies. He therefore has not met his burden on appeal of demonstrating reversible error. *See Arrow Int'l, Inc. v. Sparks*, 81 Ark. App. 42, 98 S.W.3d 48 (2003).

However, Meadors is more exact with regard to his case against Combined Insurance Companies. His complaint asserts that Combined was an obligor on the Interdependency Memo, which he described as a contract between him, ARS Arkansas, and Combined. He further alleged that a breach occurred when Combined and ARS Arkansas failed to pay him the amounts called for in the contract. Moreover, in his response to the defendants' motions for summary judgment, Meadors attached Combined's responses to requests for admission, in which Combined admitted that the Interdependency Memo accurately set out the terms and conditions of an agreement among Aon entities identified on the first page (which included Combined), and that Combined was a participant in the Interdependency program. The Memo itself was also attached, showing that Combined had agreed to deposit certain amounts into a bonus pool. Further, it was undisputed that Combined did not place monies from the Dillard's transaction into the bonus pool. We need only decide if the trial court's grant of summary judgment was appropriate based on whether the evidence presented by the moving party left a material question of fact unanswered. *Doe v. Baum*, 348 Ark. 259, 72 S.W.3d 476 (2002). Because the evidence showed that a material question of fact remained with regard to whether Combined breached a contract with Meadors, summary judgment was inappropriate as to Combined. *See generally Newberg v. Next Level Events, Inc.*, 82 Ark. App. 1, 110 S.W.3d 332 (2003).

Combined argues that it was nevertheless entitled to summary judgment because Meadors testified at trial that his only contract was with ARS Arkansas. However, by the time of trial, Meadors's only remaining cause of action was against ARS Arkansas; Combined had already been dismissed from the case. In any

event, Meadors's deposition attached to his response to the motions for summary judgment and his complaint assert that his contract was with ARS Arkansas and Combined. We therefore reverse and remand the award of summary judgment to Combined.[4]

## VIII.  Summary Judgment on Other Causes of Action

The trial court also granted summary judgment against Meadors on his claim that he was a third-party beneficiary of the Interdependency Memo and on his claims of fraud and unjust enrichment.

■ Meadors's third-party beneficiary count was pled as an alternative to his allegation that the Interdependency Memo created a unilateral contract. Because we hold today that a unilateral contract was created by the Memo and that Meadors, by his acceptance, was an obligee under the Memo, his alternative third-party beneficiary claim is no longer extant. We therefore decline to address this moot point. *See Davis v. Williamson*, 359 Ark. 33, 194 S.W.3d 197 (2004).

Meadors's unjust-enrichment claim is likewise moot because it was not asserted against either ARS Arkansas or Combined Insurance Companies but against other Aon companies, which we have already determined were entitled to summary judgment.

This leaves the fraud count for our consideration. Meadors's complaint essentially alleged that Combined and ARS Arkansas committed fraud by publicizing the Interdependency Memo with the intent of inducing the sale of products but with no intent of abiding by agreement and by not allocating to him what was earned from the Dillard's transaction. As damages, he sought his full compensation under the Interdependency Memo. In light of our decision that ARS Arkansas breached the contract created by the Memo and our holding that a fact question remains as to whether Combined did the same, we see no point in reversing a summary judgment on a fraud count that is, for all practical

[4] Our reinstatement of Meadors's damages on the Dillard's transaction seemingly renders his case against Combined on the same transaction moot. However, during oral argument, Meadors asked that, if we reinstated his award, we nevertheless review the entry of summary judgments in favor of other Aon entities, in the event that he is unable to collect on his judgment against ARS Arkansas.

purposes, based on a breach of contract and seeks the same damages that Meadors has already been awarded. We therefore consider this point moot as well.

### IX. Conclusion

We affirm the jury's verdict for breach of a unilateral contract against ARS Arkansas and reinstate Meadors's damages of $2,406,522.60 pertaining to the Dillard's transaction. We affirm the jury's damages award of $3105 on the Cambridge transaction and affirm the trial court's reduction of damages on the JB Hunt account and on Meadors's claim for unpaid compensation. We also affirm the trial court's grant of summary judgment against all other Aon entities except Combined Insurance Companies, which we reverse. We decline to address the grant of summary judgment on Meadors's three additional causes of action as moot. Finally, we reverse and remand for the trial court to reconsider the attorney-fee award and to award prejudgment interest.

Affirmed in part; reversed and remanded in part.

ROBBINS, J., agrees.

BAKER, J., concurs.