SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISIONS IV & I
**No.** CV–15–982

**Opinion Delivered** May 11, 2016

JOAN TILLMAN BELCHER, SPECIAL
ADMINISTRATRIX of THE ESTATE of
CORNELIUS TILLMAN, DECEASED

APPELLANT

V.

JERRY DENTON

APPELLEE

APPEAL FROM THE PULASKI
COUNTY CIRCUIT COURT,
THIRD DIVISION
[NO. 60CV-12-3452]

HONORABLE CHRIS PALMER,
JUDGE

AFFIRMED

## WAYMOND M. BROWN, Judge

Joan Tillman Belcher, Special Adminstratrix of the Estate of Cornelius Tillman,
appeals the June 19, 2014 judgment of the Pulaski County Circuit Court finding that Tillman
was forty-nine point nine percent (49.9%) at fault in causing his own death and reducing the
$7,612 judgment by that percentage. On appeal, appellant argues that (1) there was no
evidence that Tillman was negligent, and, therefore, the issue of his negligence should not
have been submitted to the jury; (2) the jury instructions and verdict form given to the jury
were improper; and (3) the damages awarded by the jury were insufficient and failed to take
into account all elements of the injury proven. We affirm.

This case arose from a fatal pedestrian collision. Jerry Denton was driving through Wrightsville, Arkansas,[1] at approximately 5:00 a.m. on June 2, 2011, when he fatally struck Tillman. Belcher, as special administratrix of Tillman's estate, brought a negligence action against Denton seeking damages for wrongful death as well as punitive damages. The central dispute at the jury trial was whether Denton crossed the center line into the southbound lane and struck Tillman. Belcher filed a motion in limine four days before the jury trial to prevent Denton from arguing comparative fault to the jury. The court addressed the motion at the beginning of trial on June 10, 2014. The court denied the motion, and the trial proceeded as scheduled.

Joe Weare[2] testified that he lived close to where the accident occurred on June 2, 2011, and that a surveillance camera at his home captured images before and after the accident. He stated that once he learned of the accident, he informed police officers that his camera may have captured at least part of the accident. He testified that he copied short video clips from his computer's hard drive and placed them onto a CD for the police. Weare stated that his camera caught Tillman walking down the street on June 2, 2011, at 5:00:56 a.m. He said that the next clip, at 5:01:26 a.m., showed the light of Denton's vehicle coming northbound a few seconds after Tillman walked out of view.

---

[1]The accident took place on Arkansas State Highway 365.

[2]Weare is the owner of Infinity Data, which provides security, alarm systems, and cameras.

SLIP OPINION

On cross-examination, Weare stated that his camera had a motion sensor. He testified that his camera captured Denton's vehicle as it passed in front of the camera at 5:01:34 a.m. He stated that the vehicle passed the camera again at 5:02:33 a.m.

On redirect, Weare stated that Denton's vehicle was caught in segments between 5:01:44 and 5:02:09, turning around and coming back. He testified that the final segment showed Denton traveling back in the direction he was originally going beginning at 5:02:21 a.m.

Trooper First Class Robert Middleton of the Arkansas State Police testified that he was dispatched to a pedestrian accident on June 2, 2011, on Highway 365 just south of 145th Street. He stated that upon arrival, he was shown Tillman's body. He also stated that items were scattered along the road that appeared to belong to Tillman. Middleton indicated that as part of his investigation, he noted and measured the location of the debris, Tillman's body, and where he believed the vehicle was. He stated that he concluded that Denton, who was traveling north, crossed the southbound lane and struck Tillman with the left front of his vehicle. Middleton opined that Tillman was thrown approximately 140 feet north from the area of impact.

On cross-examination, Middleton testified that he had not changed his opinion that Tillman was struck in the southbound lane. He conceded that he was not an accident reconstructionist. Upon further questioning, Middleton stated that it was possible for the debris to end up where it was if Denton was in the northbound lane close to the center line.

SLIP OPINION

Additionally, he stated that it was also possible that Denton was in the northbound lane the whole time.

Special Agent Joe Pickett of the Arkansas State Police testified that he worked in the criminal investigation division. He stated that he got involved in the case in his capacity as a criminal investigator because the case was initially a hit-and-run involving a fatality. He said that when he arrived at the scene, Denton was in the back of a Pulaski County deputy's car. Denton told Pickett that he remained in the northbound lane the entire time and that he believed he had struck an animal or something. According to Pickett, Denton stated that he turned around to see what he had struck and could not locate anything. Denton then continued to Walmart. Pickett stated that he was approached by Weare while at the scene and informed that the accident may have been captured on camera. He stated that Weare provided Trooper Stacy Sims with the video clips, but that he (Pickett) had reviewed them. Pickett testified that his main goal was to determine whether Denton crossed the center line. He stated that he concluded that Denton had crossed the center line at some point; however, he said that he could not determine the exact area of impact due to the lack of evidence at the scene.

On cross-examination, Pickett stated that he was unable to determine in which lane the impact took place. He said his dilemma was whether or not Denton's vehicle touched or crossed the center line. He testified that he could not say that Denton's left tire crossed the center line.

4

On redirect, Pickett stated that based on the physical evidence, it was his belief that Denton's vehicle crossed into the southbound lane at some point. However, he testified on recross that he could not say whether Denton's vehicle crossed into the southbound lane before or after impact.

Denton was initially questioned by Belcher's attorney. Denton testified that he was an airplane enthusiast and that he had been at the flying field in Wrightsville before the accident. He stated that he left the field a little before 5:00 a.m. on June 2, 2011, to go purchase some butter from Walmart in order to be able to prepare pancakes and French toast for some of his associates. He said that he traveled north through Wrightsville and that as he approached the liquor store, he moved over and looked toward the liquor store to make sure no one was on the side of the road. According to Denton, the impact occurred as he resumed looking forward. He stated that he looked in his rearview mirror but did not see anything. He then turned around at the car wash and went back to try to see what he had hit. He said that he thought he had hit an animal because he did not see anything. He testified that he then continued to Walmart. He stated that he was able to see that his vehicle was heavily damaged when he got out of the car at Walmart. Denton contended that he did not see Tillman's cane, white hat, or anything else to suggest that he had hit a pedestrian. He testified that he returned to the flying field going back the way he had come and still did not see anything. He stated that he subsequently learned that the police were in the area where he believed he had struck an animal and decided to drive back. He testified that when he returned, he learned that Tillman had been struck and killed by a vehicle. Denton stated that

5

when he struck Tillman, he jerked his wheel to the right and looked at his left mirror because the impact took place on the left. He said that he did not realize that the mirror was broken at that time. Denton stated that even though he only had approximately two-and-a-half hours of sleep before getting up to go to Walmart, he was not tired and did not drift from his side of the road.

Upon examination by his attorney, Denton stated that both of his eyes were wide open as he drove through Wrightsville the morning of June 2, 2011. He said that he remained in the northbound lane the entire time and that impact took place in the northbound lane. He stated that he did not believe that he had hit anyone because he had not seen anyone on the road. He testified that he turned around but that there was nothing to indicate what he hit. He stated that he did not look hard for what he hit because he had already told himself that it was a deer.

William Howard Ford testified that he was employed by EFI Global and that he was accredited in accident reconstruction though ACTAR. He stated that he was hired by Belcher's attorney to investigate the accident involving Denton and Tillman. He stated that based on his investigation, he was able to determine the area of impact and that Denton had crossed the center line. He said that Tillman was walking at a rate of approximately 1.6 miles per hour at the time of the accident. He testified that he determined the area of impact based upon Denton's and Tillman's speed and the place where they both met. He stated that based on this information, he was able to determine that Tillman had made it about 75 to 80 feet from where he was captured on camera at the time of impact. Ford stated that at some point

Denton had to cross the center line because that is the only way to explain the angle of his vehicle when it was first captured in the video clip. According to Ford, Tillman had crossed over to the other side of the road when he was hit because that was the only way Denton's vehicle could have hit Tillman on the left side. Ford stated that the evidence indicated that Denton crossed the center line.

On cross-examination, Ford admitted that he had billed appellant about $5,000 for his services at the time of the trial. He testified that he charges $185 an hour for his services. He said that Denton's vehicle was a couple of feet over the center line at the time of impact. He conceded that he did not know the point of impact because that would be too precise. He stated that he did not know how far across the road Tillman had gotten before impact. He said that it was a mystery as to why Tillman crossed the road at the time he did. He further stated,

> A vehicle coming around that curve is about 900 feet away. And a pedestrian or someone standing on the road, they should be able to see that vehicle coming around the curve. Forty-five miles per hour is 66 feet per second. That's about 15, 17 seconds away. It's a mystery why Mr. Tillman crossed the road. I don't think we all know what happened out there.

On redirect, Ford stated that he was only able to determine the general area of impact within a couple of inches of where Denton's vehicle was at the time of impact. He said that Tillman would have had to be walking at a rate of 4.4 miles per hour in order for the original point of impact to be correct; however, he stated that it was clear that Tillman was walking at a rate of only 1.6 miles per hour.

Belcher testified that she was Tillman's sister and the administratrix of his estate. She stated that his funeral cost $7,612. She stated that Tillman worked as a farmer most of his life, and that he was unemployed at the time of his death.[3] She said that Tillman grew up in Wrightsville and that everyone knew him as Uncle Connie. She stated that he was disabled and suffered from gout, which was why he used a cane. She said that Tillman loved baseball caps and just loved living. Belcher stated that Tillman did not own a car so he usually rode the bus. She said that she also picked him up and took him where he needed to go. She stated that Tillman was pretty independent. She testified that Tillman maintained a relationship with his family. According to Belcher, Tillman went to the Deluxe Liquor Store every day to visit and socialize and that he went to church every Sunday. She stated that Tillman liked to do gardening and yard work and that he would do a lot of things for his neighbors free of charge. She described him as a humble, lovable person.

Corporal Stacy Sims of the Arkansas State Police testified that he was an accident reconstructionist. He stated that he went to Wrightsville on June 2, 2011, to assist Middleton in plotting the scene. He said that there was no physical evidence that Denton's vehicle left the northbound lane and that they were unable to determine a precise area of impact. On cross–examination, Sims stated that he did not know in which lane the impact occurred.

Corporal Greg Dicus of the Arkansas State Police testified that he was an accident reconstructionist and was ACTAR certified. He stated that he went to the scene of the accident to try to locate the area of impact. He said that he disagreed with Ford's testimony

---

[3]He was 62 at the time of his death.

that he was able to find the area of impact. Dicus testified that he was unable to determine if Denton's vehicle left the northbound lane or if it was in the southbound lane. He stated that due to the lack of evidence, he was unable to determine exactly where the area of impact was. On recross, Dicus stated that he could not tell how far Tillman's body was thrown because he did not know the area of impact.

At the conclusion of the evidence, appellant made a motion for directed verdict on the issue of comparative fault. The court denied the motion. The jury returned a verdict finding that Belcher was entitled to damages in the amount of $7,612 reduced by the 49.9% fault they assigned to Tillman. Belcher's attorney asked the court for JNOV at the conclusion of the hearing without elaborating on the basis.[4]

The court entered a judgment on the jury's verdict on June 19, 2014. A notice of appeal was filed on June 20, 2014. Appellant filed a motion for new trial on July 2, 2014, contending that there was an error in the assessment of the amount of recovery and that the verdict was contrary to the preponderance of the evidence. The court never ruled on appellant's motion, and the motion was deemed denied on August 1, 2014.

In April 2015, we ordered rebriefing because appellant's abstract, brief, and addendum did not comply with our rules.[5] Once resubmitted, we dismissed this case without prejudice for lack of a final order in September 2015.[6] Appellant filed a motion to dismiss the punitive-

---

[4]There is no indication that appellant filed a motion for JNOV.

[5]*Belcher v. Denton*, 2015 Ark. App. 270.

[6]*Belcher v. Denton*, 2015 Ark. App. 492.

damages claim on September 21, 2015. The court dismissed the claim in an order filed on September 23, 2015. The court filed a final order on October 6, 2015.[7] Appellant's notice of appeal was filed on October 8, 2015. This appeal followed.

For the first point on appeal, appellant contends that there was no evidence that Tillman was negligent, and, therefore, the issue of his negligence should not have been submitted to the jury. More specifically, appellant argues that the trial court erred in denying her motion for directed verdict on Denton's assertion of comparative fault.

In reviewing a denial of a motion for directed verdict, we determine whether the jury's verdict is supported by substantial evidence.[8] Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other.[9] We only review the record for substantial evidence to support the jury's verdict.[10] In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered.[11]

---

[7]This order and the September 23, 2015 order were entered by Judge Cathleen V. Compton.

[8]*Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005).

[9]*Id.*

[10]*Id.*

[11]*Id.*

Our comparative-fault statute provides that a plaintiff cannot recover damages if his own fault is equal to or greater than the defendant's.[12] Comparative fault is typically a matter for the jury to decide.[13] A directed verdict is improper if there is substantial evidence that the plaintiff was negligent.[14]

Viewing the evidence in the light most favorable to Denton, as we must, there was substantial evidence that Tillman was negligent. There was testimony that Denton never crossed the center line and had remained in the northbound lane at all times. At some point, Tillman, who had been walking in the southbound lane, crossed the street and was struck by the left side of Denton's vehicle. We acknowledge that this case represents something of a swearing match between parties. However, the weight and value to be given the testimony of witnesses lies within the exclusive province of the jury.[15] Therefore, we hold that the trial court did not err in denying appellant's directed-verdict motion.

Next, appellant argues that the jury instructions and verdict form given to the jury were improper. Appellant contends that she objected to the use of the trial court's proposed verdict form, as well as the instruction given for comparative fault. We have already held that it was appropriate for the court to deny appellant's directed-verdict motion on comparative fault and that there was substantial evidence of Tillman's negligence. As such, the court's instruction to the jury on comparative fault was not in error.

---

[12]Ark. Code Ann. § 16-64-122(b)(2) (Repl. 2005).

[13]*See Wingate Taylor-Maid Transp., Inc. v. Baker*, 310 Ark. 731, 840 S.W.2d 179 (1992).

[14]*See Garrett v. Brown*, 319 Ark. 662, 893 S.W.2d 784 (1995).

[15]*McCoy v. Montgomery*, 370 Ark. 333, 259 S.W.3d 430 (2007).

SLIP OPINION

To the extent that appellant argues that the court erred in giving the comparative-fault instruction in this case because the case was submitted on interrogatories, this argument has no merit. When the court discussed the verdict form with the parties' attorneys, the following colloquy took place:

MR. MILLER: The problem with this, Your Honor, is that juries typically don't know – – they don't understand, and there's an instruction that clarifies it. They don't understand what they do is, they reduce the dollar amount first and then they put the percentage, whereas the rule says they should put the full amount first and then the percentage for the Court to reduce.

And there is an instruction which basically says – – let me find that. Hold on a second. It says part of the typical verdict form which says write full amount of damages here. Judge will reduce the amount of damages if necessary.

MR. TUCKER: Where are you reading from?

MR. MILLER: I'm reading from the verdict form that we submitted.

MR. TUCKER: Well, that's not – – but that's not a verdict that's approved by AMI.

THE COURT: Why don't we leave it at this? This verdict form seems to be appropriate. You can explain and argue to the jury how they're to arrive at a figure, if you'd like. That part is left in terms of closing argument.

MR. MILLER: But the verdict form as it's written is ambiguous. It doesn't say – – it's not clear.

THE COURT: Do you have another verdict form you propose?

MR. MILLER: Yes. I submitted it. And I suggest we can use your verdict form but just incorporate into that – –

MR. TUCKER: Judge, I certainly object to that.

MR. MILLER: What could be objectionable about clarifying to the jury – –

12

MR. TUCKER:    I'm prepared to tell.

MR. MILLER:    Okay.

MR. TUCKER:    The first verdict form is, "We, the jury, find in favor of Jerry Denton." Fine. No Problem. The next one says, "We find both parties are negligent. We assigned potential fault." Is that the one I'm looking at?

. . . .

MR. TUCKER:    All right. It says, "We award Joan Belcher estate dollar sign, blank, in damages (write full amount of damages. Judge will reduce amount of damages if necessary.)" That is totally incorrect.

MR. MILLER:    Your verdict form, the verdict form that you've provided, Your Honor, basically says if you found in favor of the plaintiff, state the amount of damages awarded.

THE COURT:    And they will fill that in.

MR. MILLER:    Then it says if you found both the plaintiff and the defendant were negligent – – if you found that both parties were negligent, assign each party an appropriate percentage of fault. So do they reduce – – when the fill in that – – let's just say they find Mr. Tillman 40 percent at fault and let's say they find Mr. Denton 60 percent at fault, how do they know – – but they want to give Mr. Tillman money.

How do they know whether they're supposed to reduce the amount that they give him when they write it down or do they write the full amount that they want down and let the Court reduce it based on the percentage? How do they know that?

THE COURT:    Well, it appears to me to be pretty straightforward. Mr. Tucker?

MR. TUCKER:    It's not the jury's determination. What they do is decide amount of money, the damages. Then they decide the comparative fault. It's a matter of law after that. But to state write the full amount and the judge will take care of that, that is not proper at all.

13

MR. MILLER:     But that is what happens.  If they write down $100,000 – –

THE COURT:     How about we do this?  It appears as though they have instructions for step one, step two, and so forth.  And so you concern is, they will do step one.  They'll go to step two and then step three and go back and reduce step one.

MR. MILLER:     No.  There is a step three.  Step three, Your Honor, is that once they put these numbers down, the Court then takes their percentage and applies it to the dollar amount that they put in.  That is the step three, because that's what you do.

                If they put down $100,000 and they put 40 percent and 60 percent, you then award Mr. Tillman $60,000.

THE COURT:     But that's not part of their concern.

MR. TUCKER:     That's correct.

MR. MILLER:     But they don't know that.  And my suggestion, Your Honor, is, they should know that it is the Court's job to reduce the amount that they award based on the percentages that they have given.

MR. TUCKER:     Absolutely not.

THE COURT:     Any objection to putting on the top part of this, "Please complete in chronological order"?

MR. TUCKER:     No.  No problem at all.

MR. MILLER:     I don't think that solves the problem, but – –

THE COURT:     I'll leave it off if you want.  Which would you prefer?

MR. MILLER:     You can put it on.

MR. TUCKER:     You're talking about yours?

THE COURT:     I'm talking about this one – –

MR. TUCKER:     Yeah.

THE COURT: – – that we provided. "Please complete the following in chronological order."

MR. MILLER: Okay.

THE COURT: Let's do that.

Appellant contends that the court erred by giving the jury the proposed verdict form. However, it is clear from the colloquy that appellant's only objection to the verdict form was the jury's understanding of it. The court offered to place specific language in the verdict form instructing the jury to answer the questions in the order presented. Appellant agreed to this additional language. Appellant maintains that the verdict form was improper since it was an interrogatory and not a general verdict form. However, appellant's argument is not preserved because appellant raises this issue for the first time on appeal. It is well settled that issues not raised or ruled on in the circuit court will not be considered for the first time on appeal.[16]

Finally, appellant argues that a new trial should have been granted because the jury's verdict was insufficient. This argument is not preserved for our review. Appellant filed a motion for a new trial on July 2, 2014. That motion was deemed denied on August 1, 2014. Appellant filed a notice of appeal after the October 6, 2015 final order. In that notice, appellant stated that she was appealing the October 6, 2015 order. She did not state that she was also appealing the deemed denial of her motion for a new trial. Pursuant to Rule 3 of the Arkansas Rules of Appellate Procedure–Civil,[17] a notice of appeal must designate the

---

[16] *See Ark. Contractors Licensing Bd. v. Pegasus Renovation Co.*, 347 Ark. 320, 64 S.W.3d 241 (2001).

[17] (2015).

15

judgment or order appealed from, and an order not mentioned in the notice of appeal is not properly before an appellate court.[18]

Affirmed.

GLADWIN, C.J., and HARRISON, GRUBER, GLOVER, and VAUGHT, JJ., agree.

*The Law Offices of Peter Miller, P.A.*, by: *Jessica Virden*, for appellant.

*W. Lee Tucker, PLLC*, by: *W. Lee Tucker*, for appellee.

---

[18]*Johnson v. De Kros*, 2014 Ark. App. 254, 435 S.W.3d 19.